```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION


 3
     In Re: NEO WIRELESS, LLC,    )  Civil Case No.
 4   PATENT LITIGATION            )  2:22-md-03034-TGB

 5   _____

 6                        MARKMAN HEARING
              BEFORE THE HONORABLE TERRENCE G. BERG
 7                 UNITED STATES DISTRICT JUDGE
              HEARING CONDUCTED VIA VIDEO CONFERENCE
 8              ALL PARTIES APPEARING REMOTELY
                   Wednesday, June 21, 2023
 9

10   APPEARANCES:

11   FOR THE PLAINTIFF:    JASON DODD CASSADY, ESQ.,
                           CHRISTOPHER S. STEWART, ESQ.,
12                         BJORN BLOMQUIST, ESQ., and
                           HAMAD M. HAMAD, ESQ.
13                         Caldwell Cassady & Curry, P.C.
                           2121 N. Pearl Street, Suite 1200
14                         Dallas, Texas 75201
                           (214) 888-4848
15

16   FOR AMERICAN HONDA:   RUFFIN B. CORDELL, ESQ. and
     MOTOR CO. INC.        JOHN T. JOHNSON
17                         Fish & Richardson
                           1425 K Street NW
18                         11th Floor
                           Washington, D.C. 20005
19                         (202) 783-5070

20   FOR FORD MOTOR CO.:   JOHN S. LeROY, ESQ. and
                           KYLE G. KONZ, ESQ.
21                         Brooks Kushman
                           1000 Town Center, 22nd Floor
22                         Southfield, Michigan 48075
                           (248) 358-4400
23

24

25
```

```
1    APPEARANCES (Continued):

2    FOR VOLKSWAGEN:      WILLIAM MILLIKEN, ESQ.
     GROUP OF AMERICA     Stern Kessler Goldstein & Fox
3                         1100 New York Avenue, NW
                          Suite 600
4                         Washington, D.C. 20005
                          (202) 371-2600
5

6    FOR TOYOTA MOTOR:    BRIAN K. ERICKSON, ESQ.
     NORTH AMERICA, INC.  DLA Piper, LLP
7                         303 Colorado Street, Suite 3000
                          Austin, Texas 78701-3799
8                         (512) 457-7059

9    FOR GENERAL MOTORS:  JOSEPH ANTHONY HERRIGES, JR., ESQ. and
                          JAMES HUGUENIN-LOVE, ESQ.
10                        Fish & Richardson, P.C.
                          60 South 6th Street, Suite 3200
11                        Minneapolis, Minnesota 55402
                          (612) 335-5070
12

13   FOR TESLA, INC.:     LAWRENCE JARVIS, ESQ.
                          Fish & Richardson
14                        1181 Peachtree Street, NE
                          Suite 21st Floor
15                        Atlanta, Georgia 30309
                          (404) 892-5005
16

17   FOR NISSAN NORTH:    PETER J. BRENNAN, ESQ. and
     AMERICA, INC.        REGINALD J. HILL, ESQ.
18                        Jenner and Block, LLP
                          353 N. Clark Street
19                        Chicago, Illinois 60654-3456
                          (313) 222-9350
20

21   FOR FCA US, LLC:     ROBERT C. TAPPARO, ESQ.
                          Venable, LLC
22                        600 Massachusetts Avenue, NW
                          Washington, DC 20001
23                        (202) 344-4439

24

25
```

```
1    APPEARANCES (Continued):

2    ALSO PRESENT:          Leo Weissburg, Law Clerk to the Court
                            Scott Woloson, Special Master
3                           Paaras Modi
                            Rodeen Talebi
4                           Paul Steadman

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   REPORTED BY:           Darlene K. May, CSR, RPR, CRR, RMR
                            darlene_may@mied.uscourts.gov
22                          (313) 234-2605

23

24

25
```

1                        <u>TABLE OF CONTENTS</u>

2     <u>PROCEEDINGS:</u>                                    <u>PAGE:</u>

3       Appearances                                     5

4       Preliminary Matters before Hearing              8

5       Claim Construction Hearing

6           Court Addresses 1st Set of Terms           10
            Court Addresses 2nd Set of Terms           32
7           Court Addresses 3rd Set of Terms           32
            Court Addresses 4th Set of Terms           51
8           Court Addresses 5th Set of Terms           58
            Court Addresses 6th Set of Terms           69
9           Court Addresses 7th Set of Terms           89
            Court Addresses 8th Set of Terms           99
10          Court Addresses 9th Set of Terms          102
            Court Addresses 11 - 13 Set of Terms      112
11          Court Addresses 14th Set of Terms         115
            Court Addresses 15th Term                 121

12

13    Court Reporter's Certificate                    133

14

15    <u>EXHIBITS:</u>

16          (None offered)

17

18

19

20

21

22

23

24

25

```
 1                    Wednesday, June 21, 2023

 2                    10:06 a.m. EST.

 3                         -- --- --

 4            THE LAW CLERK OF THE COURT:  Hear ye.  Hear ye.  Hear

 5    ye.  The United States District Court for the Eastern District

 6    of Michigan is now in session.  The Honorable Terrence G. Berg

 7    presiding.

 8            All ye having business before the Court, draw near,

 9    give attention and ye shall be heard.  God save the United

10    States of America, and this Honorable Court.

11            The Court calls case number 22-03034, In Re: NEO

12    Wireless, LLC, Patent Litigation.

13            Counsel, please place your appearances on the record.

14            MR. STEWART:  Good morning, Your Honor.  Chris Stewart

15    for the plaintiff, NEO Wireless.

16            Also speaking today with my firm on behalf of NEO

17    Wireless is Hamad Hamad and Bjorn Blomquist.  They'll both be

18    using the same window whenever they speak.

19            THE COURT:  Well, good morning to you, Mr. Stewart,

20    Mr. Hamad and Mr. Blomquist.  And --

21            MR. STEWART:  And I apologize, also -- I'm sorry, Your

22    Honor.

23            I meant to also introduce Mr. Cassady, our lead

24    counsel.  He's also present.  He has to travel today to a

25    pretrial hearing out of town tomorrow morning.  So he might not
```

1  be able to remain for the entire hearing, but he is present in

2  the room now.

3              THE COURT:  Thank you.

4              And welcome, Mr. Cassady, as well.

5              So let's go through our defendants here.  So I'm just

6  looking at the docket.  So how about for Honda?

7              MR. CORDELL:  Good morning, Your Honor.  It's Ruffin

8  Cordell and John Johnson on behalf of Honda from Fish &

9  Richardson.

10             THE COURT:  Mr. Cordell, Mr. Johnson, welcome.

11             And from Ford?

12             MR. LeROY:  Good morning, Your Honor.  This is

13  John LeRoy from the firm, Brooks Kushman for Ford.  And with me

14  today as well is Kyle Konz, K-o-n-z.

15             THE COURT:  Mr. LeRoy, Mr. Konz, welcome.

16             How about for Volkswagen?

17        (No response.)

18             THE COURT:  Do we have anyone from Volkswagen?

19             THE CLERK OF THE COURT:  I'm seeing two hands that

20  have been raised.  Let me admit them as panelists.

21             MR. MILLIKEN:  Good morning, Your Honor, William

22  Milliken from Sterne Kessler Goldstein & Fox on behalf of

23  Volkswagen.  I had not intended on speaking today which is why

24  I was not previously on video.

25             THE COURT:  I understand.  Well, welcome to you,

1    Mr. Milliken.

2              MR. MILLIKEN:  Thank you, Your Honor.

3              THE COURT:  Very good.  Let's see.  How about for

4    Toyota?

5              MR. ERICKSON:  Good morning, Your Honor.  Brian

6    Erickson and Ankur Desai with DLA Piper for Toyota.

7              Also joining us as an observer is Paul Steadman with

8    DLA Piper.

9              THE COURT:  Good morning, Mr. Erickson.

10             And let's see here.  How about for GM?

11             MR. HERRIGES:  Good morning, Joe Herriges from Fish &

12   Richardson on behalf of General Motors.  And with me is James

13   Huguenin-Love, who also will be representing today.

14             THE COURT:  Welcome, Mr. Herriges and Mr. Love.

15             Do we have someone from Tesla?

16        (No response.)

17             THE COURT:  How about from Nissan?

18             MR. HILL:  Good morning, Your Honor.  This is Reggie

19   Hill with Jenner and Block on behalf of Nissan, the Nissan

20   defendants.  I also have my colleague, Peter Brennan, on the

21   screen with me.

22             Separately, my colleague, Paaras Modi, M-o-d-i --

23   Paaras is P-a-a-r-a-s -- is controlling the slides.  I'll be

24   doing some of the speaking during the course of the hearing.

25             THE COURT:  Very good.  And welcome to you as well.

1        We don't have Mercedes-Benz anymore.

2        How about for FCA?

3        MR. TAPPARO:  Good morning, Your Honor.  Robert

4  Tapparo of Venable for FCA.

5        THE COURT:  Good morning, Mr. Tapparo.

6        Let's see.  Is there any other defendant who I have

7  not mentioned?

8        MR. JARVIS:  Good morning, Your Honor.  This is

9  Lawrence Jarvis for Tesla.  I was not a panelist when you

10  asked.  I was just promoted.  I wasn't planning on speaking

11  today and I was not a panelist when you initially asked.  But

12  this is Lawrence Jarvis on behalf of Tesla.

13        THE COURT:  Very good.  And welcome to you as well.

14        MR. JARVIS:  Thank you.

15        THE COURT:  All right.  So, good morning.  We have our

16  claim construction hearing on the docket and I'm going to be

17  hearing from both sides in this matter.

18        I think you've probably received our preliminary

19  construction that was sent out last night that we've been

20  working on here and I wanted you to know that that preliminary

21  construction is just that, it's preliminary.  I don't want you

22  to think that it represents in any sense a final judgment or

23  decision by me regarding what the construction is that we

24  should apply to these terms.  But I thought it might be helpful

25  to give you a sense of how it currently sits with me after

1   having looked it over and reviewed the materials.  Because I

2   thought it might help you to focus your arguments.  Don't feel

3   in any way that you're stuck with what I have in there, but let

4   it be a representation of the fact that I have looked at this,

5   I've given it some thought and we can get a sense of perhaps

6   how I view the issues at this stage without having had the

7   benefit of oral arguments through your presentations today.

8           I did want to thank a couple of people.  I want to

9   thank our intrepid court reporter here who is going to be

10   hearing all these technical terms and getting them all down

11   accurately.  I know you'll assist her regarding that and I

12   thank you in advance for that.

13           I want to thank Mr. Woloson, of course, our technical

14   advisor, who has been rendering invaluable service to the Court

15   and I'm very greatful for his assistance in helping me to

16   grapple with this area, which is very unusual and technical and

17   takes a lot of digestion and consideration and reading to try

18   to feel like we can get a grasp on what these terms are and

19   what the technology is.

20           I want to thank also Mr. Weissburg, who is our law

21   clerk, who is present today as well.

22           So you know you've each got about an hour and a half

23   today to go through the materials.  We would like to proceed in

24   the order of the terms that we have presented in our proposed

25   construction to you.

1       So I thought it would be a good idea and you probably

2   saw in the E-mail that Mr. Woloson sent out last night that

3   each of you should be given the opportunity to decide who you

4   think should go first with these terms.

5       And how much time you think you'd need for them.  Now

6   at first I see that you did agree to an interpretation of the

7   term "configure to".  The terms "configure to" that are

8   contained in, I think, all the patents.  So we don't need to

9   address that.

10      The next disputed term that we have is from the '366

11  patent.  It's in claims 1 and 17 and that phrase that we're

12  talking about construing here is, quote, the ranging signal

13  exhibits a low peak-to-average power ratio in the time domain,

14  closed quote.

15      So which side here, plaintiff or defendant would like

16  to go first regarding this set of terms?

17      MR. HERRIGES:  Good morning, Your Honor.  This is Joe

18  Herriges for General Motors.  The parties have agreed that we

19  will proceed first on this particular claim as we are

20  challenging its definiteness and NEO will proceed first on the

21  remainder of the claims at issue.

22      THE COURT:  And how much time do you need, Mr.

23  Herriges?

24      MR. HERRIGES:  I would expect on the order of 15 to 20

25  minutes, Your Honor.

1          THE COURT:  All right.  So that's a pretty hefty

2     amount in light of the time available, but this is perhaps one

3     of the knottier questions.  So as long as you all know that

4     both sides gets or needs about that much time, then that does

5     take a chunk out of our hearing time today.  But if that's what

6     you think you need and if it's acceptable to both sides, then

7     we can go ahead with that and we'll be relying on Mr. Weissburg

8     to keep time.

9          So why don't you go ahead and I'd be happy to hear

10    your oral arguments.

11          MR. HERRIGES:  Okay.  Let me share my screen here,

12    Your Honor.  Just make sure you can see it.

13        (Slideshow displayed and shown throughout presentation.)

14          MR. HERRIGES:  Your Honor, are you able to see the

15    slides now?

16          THE COURT:  I can.  Go ahead.

17          MR. HERRIGES:  Wonderful.  So as Your Honor said,

18    we're going to start here with the '366 patents and the term at

19    issue here really focusses on these words "low peak-to-average

20    power ratio in the time domain."

21          And I skipped ahead to Slide 11, where we're really

22    focusing on that.

23          We've got here on Slide 12, just to put a little

24    context, this is where the claim language appears in claim one.

25          But, again, moving to Slide 13, the key issue here is

1   really on this term "low".

2           The key dispute, which we have highlighted on the

3   bottom of Slide 13, is "whether the intrinsic record provides

4   objective boundaries for a 'low' peak-to-average power ratio."

5           Our position, defendant's position, is the answer to

6   that question is no and the term is otherwise not one that is

7   readily understood in the art and is, therefore, indefinite.

8           NEO, on the other hand, proposes two alternatives.

9   They propose a plain and ordinary meaning but without

10  indicating what that meaning is.  And then they propose an

11  alternative, specific measurements, of -- and this is, if you

12  go to the very bottom here a peak-to-average power ratio of

13  9dBs, or decibels, or less, which it pulls from the extrinsic

14  *Baxley and You* articles.

15          There's really three important points that I want Your

16  Honor to take away from my presentation this morning.  And I'm

17  going to take them in order.  But they are first that the

18  intrinsic record does not provide any objective boundaries and

19  I don't think we're going to hear any serious argument from

20  either side that they admit it does.

21          The second point, Your Honor, is when the PTO focused

22  on this limitation in related patents, it either found it

23  indefinite -- or excuse me.

24          It did find it indefinite and NEO either acquiesced to

25  that finding by abandoning the application or removing this

1    specific claim limitation in order to obtain allowance.

2            And the final point, Your Honor, is that the extrinsic

3    evidence that NEO seeks to use here is irrelevant as a factual

4    matter and also legally improper because they seek to

5    incorporate specific measurements from extrinsic evidence,

6    which the federal circuit has, as a matter of black letter law,

7    said you just can't do in claim construction.

8            So with that in mind, Your Honor, I want to turn to

9    sort of threshold issues in the case law.  And I have on Slide

10   14 here the sort of key case, which is the *Biosig versus

11   Nautilus* matter, where the Court makes clear "when a word of

12   degree is used, the court must determine whether the patent

13   provides some standard for measuring that degree."

14           And I think one thing the parties do agree on here is

15   that when we're talking about low, there's no dispute that that

16   is a word of degree.  And so within this Universe of *Nautilus*,

17   we're determining whether the intrinsic record provides

18   guidance on that term.

19           More specifically, I think the *Berkheimer* case is an

20   important one to focus on where, as you see on Slide 15, we've

21   highlighted a couple of important facts here.  The term at

22   issue there was that the "archive exhibits minimal redundancy."

23           So, again, a term of degree, minimal.  And the federal

24   circuit made clear that the question is not what must exhibit

25   minimal redundancy but rather how much is minimal.

1          And I say that's important here because we hear a lot

2     from NEO that there's an understanding that you would compare

3     the baseline to the reduction in order to determine whether

4     something was low.  And what *Berkheimer* tells us is that that's

5     not the relevant question.  The relevant question is how low is

6     a low PAPR.

7          I'll be very brief on the sort of technical aspects of

8     this, Your Honor.  But when we're talking about PAPR -- and we

9     laid this out in the technology tutorial -- essentially what

10    that means is, when you put off a signal, it has an average

11    power and it has a peak power.  And the peak is -- those are

12    sort of the highest points indicated by the red line on Slide

13    16 in that right graphic.  And the average power is indicated

14    by that black line.

15         And the peak-to-average power is expressed as a ratio

16    of decibels between that red line and that black line.

17         All right.  So starting with the first important point

18    that I said I was going to make at the outset.  And that is,

19    when we're talking about the intrinsic record here and what the

20    intrinsic record provides, what you see on Slide 17 is it.

21    What the intrinsic record says is limited to this paragraph in

22    the specification that relates to the time-domain signal

23    exhibiting a "relatively low peak-to-average power".

24         And it goes on from there to say that this can result

25    in improvements in power efficiency of the mobile station

1    transmission power amplifier.

2           But importantly, it doesn't say what constitutes low.

3    It doesn't provide any formula or any way to calculate from an

4    objective standpoint what constitutes low nor does it

5    articulate what would constitute an improvement or how much

6    improvement would be achieved by reaching the undefined low

7    quality that the patent speaks about.

8           And we have a good degree of expert testimony on this,

9    Your Honor, from both sides.  What we hear from Dr. Axl,

10   defendant's expert, on Slide 18 is, as we cite in our brief,

11   "This disclosure does not clarify what the '366 patent

12   considers low PAPR."  And indeed, adds additional uncertainty

13   by using phrase -- using additional terms of degree like

14   "relatively" and "improved" which are also undefined.

15          Of equal important, as I move to Slide 19, this is not

16   a term -- you know, you could imagine a patent might not define

17   every single term because some terms may be known in the art.

18   This is not one of those terms.  The word "low" in reference to

19   PAPR is not -- as our expert Dr. Axl says here, it's not used

20   generally or in the context of the ranging signal.  There's no

21   industry standard for making that assessment.

22          I'll move through this next slide relatively quickly.

23   But we also have testimony in the record here from an expert

24   who submitted a declaration, Mr. James Proctor, on behalf of

25   the Dell defendant who NEO had sued earlier and settled with

1  before the claim construction issue was resolved.  But

2  nevertheless, as you see on Slide 20, indicating the same thing

3  as Dr. Axl does that there is no consensus threshold -- if you

4  look at paragraph 23 there, which we've highlighted.

5       "There is no consensus threshold defining what

6  peak-to-average average power ratios constitute 'low.'"

7       We turn to what NEO has to offer.  I think this is of

8  equal importance.  We talked both about what it means to be

9  low, but we also talk about where the baseline is.  And even

10 NEO's expert concedes that there is not some defined baseline

11 from which we can determine whether a deduction has been low.

12 As he says in his declaration there are "different specific

13 implementations of these networks at issue that could have

14 different baseline PAPRs."

15      And that's consistent with what Dr. Axl says in

16 paragraphs 37 and 40 of his declaration where he says that a

17 baseline PAPR can be as high as 24 decibels.

18      Your Honor, moving to the what I think is the second

19 important point here.  When the patent office focussed on this

20 claim language, this specific claim language in other

21 applications, in other related applications, it found that it

22 was indefinite.

23      You can see here in the *Child* application of the '366

24 patents, the patent office specifically says that a low

25 peak-to-average ratio is indefinite as it is unclear how low

1    the ratio should be to be considered, quote, low as claimed.

2         So that's independent from any arguments we're making,

3    which is the patent office making that determination.  And then

4    we see here NEO doesn't fight this issue.

5         Moving to Slide 23, I've got on the left of Slide 23

6    an amended claim.  And what they did in this amended claim is

7    they deleted that very language.  They deleted this language is

8    in acquiescence with the PTO's order and were able to get

9    issuance only after deleting that language.

10        We see a similar thing in the '677 application, which

11   we also talk about in our brief.  Where, again, on Slide 24,

12   we've got here a final rejection from the patent office where

13   in that second highlighted portion, the patent office says "it

14   is impossible to identify which results of the autocorrelation

15   are considered 'high' and which are considered 'low.'".

16        And here NEO subsequently abandoned this application

17   after the patent office made this determination.

18        I've gotten here just a sort of summary slide on Slide

19   25, Your Honor, just to put a little timing context into this

20   when the specific applications were filed, when the rejection

21   occurred and when the abandonment or the amendments occurred.

22   And I think an important thing for Your Honor to consider is

23   the timing of the *Nautilus* decision which is what is governing

24   us here, changing the standard from insolubly ambiguous to

25   reasonable certainty.

1    And you can see that the abandonments happened after

2  the *Nautilus* decision and the removal of the "low" PAPR

3  happened after the *Nautilus* decision.  So that's -- so those

4  things happened after the operative case law that we are sort

5  of arguing about here was put into place.

6    Your Honor, the third and final point I want to make

7  is with regard to the extrinsic evidence that we see from NEO.

8  And just to set the table a little bit, the federal circuit in

9  the case I have on Slide 26, and many, many others, has said

10 that "it is improper to import a limitation into a claim where

11 the limitation has no basis in the intrinsic record."

12    And that's really what NEO is trying to do here.

13 There is no accepted definition of ER.  There is no indication,

14 any intrinsic record how low needs to be low to be considered

15 low within the claims.  And so what we see on Slide 7 (sic)

16 what NEO does is they go out and they find a couple of

17 articles, academic articles, and take the reduction in PAPR

18 that those articles were able to achieve from a theoretical

19 standpoint, and they try to read it into the claims.

20    So they say here on Slide 27 that a skilled artisan

21 would understand the relevant difference in PAPR of 3dBs for a

22 reduced PAPR to be low in the context of the patented claims.

23    So they don't cite to anything intrinsic.  They don't

24 cite to any sort of standards or any sort of governing

25 definition.  They cite to this Baxley and this You article.

1    And as a threshold matter, this is textbook reading in of

2    extrinsic evidence that has no basis in the claims.

3           But even more than that, these articles are really

4    irrelevant as a factual matter.  What these articles are about,

5    Your Honor -- and I'm not going to get too deep into the weeds.

6           But there is a goal in the Baxley article to figure

7    out theoretically how to use certain mathematical techniques to

8    reduce PAPR as an absolute matter.

9           You know, if we increase the multiples -- if you're

10   looking at Slide 28 on the left there.  If we increase the

11   number of times we multiply against the data from one to 10,

12   what happens?  Well, what they found out is you see a reduction

13   in PAR across the board at different error rates.  But in no

14   way are they saying that this PAR reduction that they were able

15   to find in this theoretical article is somehow governing of the

16   standard more generally or governing the way the '366 patent

17   approaches this.  They're simply indicating that they were able

18   to lower the PAR using certain techniques.  Not that this

19   constitutes a, quote, low PAR or that a skilled artisan would

20   understand that.

21          In fact, when you go sort of up the chain here from --

22   if you've got 10 to the negative four.  And if you go up 10 to

23   the negative one, the reduction actually changes over time.  So

24   it's not as if we can say that a 3dB reduction or a reduction

25   from 12 to 9 is something that's an objective boundary.

1    Because even looking at what they've provided, that boundary

2    shifts depending on the input and that's not something that is

3    consistent with reasonable certainty.

4         You see here, moving to Slide 29, again, Mr. Axl

5    disagreeing with Mr. Alberth that his publication would have

6    informed a skilled artisan about the meaning of low PAPR in the

7    context of the '366 patent.

8         The You article, I'm going to spend a little bit less

9    time on this, Your Honor, just for the sake of time, it's

10   simply because it suffers from the same deficiencies as Baxley.

11   The same issues apply here.  It's a theoretical technique that

12   uses a different system than the claims system and it's based

13   on a series of assumptions that are theoretical and not trying

14   to say as an absolute matter what constitutes low, what

15   percentage of baseline constitutes low, where to start to

16   determine whether something is low.  That's nowhere in the

17   Baxley article.  It's purely extrinsic and purely

18   theoretical.

19        And again, moving to Slide 31 we have the same

20   testimony from Dr. Axl on this point that we saw with respect

21   to Baxley.

22        Your Honor, I think the point I really want to close

23   on here is what NEO is providing here is really a false choice

24   with no suitable outcome under their framework.  On the one

25   hand, they're arguing that plain and ordinary meaning should

1   apply, but they don't say what that plain and ordinary meaning

2   is and I don't think there is any serious argument that there

3   is a plain and ordinary meaning here for defining what low is

4   in the art and because of that they're forced to pivot to an

5   alternative, which is equally flawed and equally counter to

6   black letter federal circuit law.

7          And that is they're seeking to read in these very

8   specific measurements from the extrinsic evidence and that is

9   textbook flawed logic from the context -- or from the point of

10  reading in extrinsic record.  Nothing in the extrinsic says

11  anything about 9dBs or less being the threshold for low.

12         The only place you're going to see that is in the

13  extrinsic record, which as I've said earlier, does not even

14  provide a factually relevant framework for determining what

15  this term means as the '366 patent uses it.  And for that

16  reason, Your Honor, we would urge you to find that it's

17  indefinite.

18         THE COURT:  Well, thank you very much, Mr. Herriges.

19  A quick question for you.  With respect to what a person of

20  ordinary skill of art would think about this term.  Do you see

21  that as a factual question that the skilled artisan would

22  decide?

23         MR. HERRIGES:  I don't think here it's a factual

24  question because I think the only evidence of record that a

25  skilled artisan would know that -- when determining whether

1    something is low you are making a comparison between a baseline

2    which to be clear is undefined and the particular system at

3    issue.  I think that's the only sort of thing a skilled artisan

4    would understand and I don't think there's a factual question

5    about that particular issue.  I think we would agree with that.

6    The problem is that there is simply -- there is no evidence

7    that there is any particular baseline from which to make that

8    determination or any threshold as to how low is too low.

9            So I don't think it's a factual question there because

10   there's simply no evidence to support what NEO is saying here.

11   I think it's a legal issue of deficiency of anything at all

12   that would lead to reasonable certainty.

13           THE COURT:  All right.  Thank you very much, sir.

14           MR. HERRIGES:  Thank you, Your Honor.

15           THE COURT:  So who would like to respond to this with

16   respect to the plaintiff?

17           MR. STEWART:  Your Honor, Chris Stewart on behalf of

18   NEO will respond.  And if I can share my screen, I can display

19   my slides here.

20       (Slideshow displayed and shown throughout presentation.)

21           MR. STEWART:  Can you see that, Your Honor?

22           THE COURT:  Yes.

23           MR. STEWART:  Okay.  So the dispute as Mr. Herriges

24   described it is slightly different than how I understood it to

25   be.  They, obviously, are proposing that this is indefinite.

1    We propose the term requires no construction.  It has a plain

2    and ordinary meaning and that it's not indefinite.

3            There's now been this allegation that our plain and

4    ordinary meaning proposal is deficient in some way, but I don't

5    think that's really borne out in the briefing so I want to

6    address that first.

7            We think there is a plain and ordinary meaning to this

8    term and we've described that in our briefing and the reason

9    why we only provided this more specific numerical definition as

10   an alternative is because we don't think you should adopt that.

11   We think that is only to the extent the Court feels that you

12   must provide a numerical boundary should you look to the

13   testimony of Mr. Alberth and apply and adopt our alternative

14   construction.

15           We think that the actual understanding of the person

16   of skill in the art as borne out by the record in this case and

17   the prior art and the intrinsic evidence is that it has a plain

18   and ordinary meaning.  Someone of skill in the art would know

19   how to discern what a low PAPR is in the context of the patent

20   with reasonable certainty because they know, as Dr. Axl has

21   admitted, and as Mr. Herriges conceded at the end of his

22   presentation, that the way you tell something is low in the

23   PAPR context is by comparing it to a baseline.

24           So that is the reason why we didn't propose any

25   specific interpretation of what the plain and ordinary meaning

1    is because it's sort of implicit in the knowledge of one who

2    has skill in the art.

3          So the first slide I want to share with you --

4          THE COURT:  Let me ask you:  When you say that a

5    person of ordinary skill in the art compared to the baseline,

6    what is the baseline?

7          MR. STEWART:  The baseline is the baseline PAPR in the

8    given system being implemented.  And so I think you heard in

9    some of the commentary from Mr. Herriges coming from Dr. Axl's

10   declaration, defendant's expert, he never disputes

11   Mr. Alberth's testimony that the baseline PAPR of a given

12   system is a known knowable thing.

13         Right?  He even says that there could be baselines in

14   certain systems that are high as 24dB.  So that may be

15   different than the exemplary general baseline that was

16   identified by Mr. Alberth as an alternative argument, but it

17   stands for the proposition, the undisputed proposition that a

18   person of skill in the art can identify and know the baseline

19   PAPR of the system.

20         And so by virtue of that fact, by virtue of the fact

21   that the conceded knowledge of the POSA is sufficient to know

22   that baseline, you then also know that the POSA will be able to

23   tell what is lower than that baseline and, hence, arrive at the

24   low PAPR.

25         THE COURT:  You can tell what is lower.  But because

1   if the baseline is a certain number, then anything below that

2   would be lower.  But is that enough?

3          MR. STEWART:  Your Honor, I think it is.  I think

4   particularly in the context of this claim language where it

5   talks about -- or specification where it talks about the basis

6   of a low PAPR being something that improves the power

7   efficiency -- we have testimony from Mr. Alberth explaining

8   that the reason you carry about power efficiency and the way

9   that you address power efficiency in the amplifier is by making

10  sure that you don't have to redesign your amplifier to

11  accommodate a special signal.

12          And he has numerous other opinions of his expert

13  testimony that goes unrebutted that a person of skill in the

14  art would know that just going below that baseline, ensuring

15  you don't have to specially design your transmitter or your

16  amplifier to accommodate this one signal is what a person of

17  skill in the art would understand to be a low PAPR in this

18  context.

19          Especially given how well-known this problem was in

20  OFDM systems, how well broad it was in the art.  And that was

21  what I was going to show you on this next slide.

22          This is from Dr. Cimini's declaration, which was

23  defendant's expert in Volkswagen's IPR, this is cited in our

24  reply brief.  These are descriptions of the prior art in that

25  IPR declaration where the prior artists are using the term low

1    PAR or low PAPR without any modifiers, without any thresholds

2    or clarifiers because it's just an understood term.

3            And if you look at the instance on the right from

4    the -- describing the Chayat reference, when he's describing a

5    sequence that can reduce the PAPR, he defines it as

6    "significantly less than the values typical for data."

7            So he's using the same metric, the same threshold that

8    we're talking about Mr. Alberth uses to say, okay, this is low

9    because it is, in fact, significantly less than the values

10   typical for data.  So it's understood in the art that the way

11   you determine if a PAPR is low in this context, is by making

12   sure it is lower than the threshold for data or the baseline of

13   the system.

14           THE COURT:  So your position is anything lower than

15   the average is low?

16           MR. STEWART:  Yes, Your Honor.  I think if you wanted

17   to adopt a sort of more express construction that captures the

18   plain meaning, I think that's right.  If it's lower than the

19   baseline PAPR, which then accomplishes all the benefits

20   Mr. Alberth talks about of not having to redesign the system to

21   accommodate that particular signal, not increasing the power

22   inefficiency of the amplifier, then you have achieved a low

23   PAPR.

24           And that's consistent with the intrinsic record of the

25   patent where it specifically calls out that improving the power

1    efficiency of the amplifier is the purpose of having a low PAPR

2    signal and that's further borne out by Mr. Alberth's testimony.

3            One other thing I wanted to address, Your Honor, about

4    the three points Mr. Herriges made.  The idea of the extrinsic

5    evidence being irrelevant, I think he focused on those articles

6    that Mr. Alberth cited.  Which, as I mentioned, those were

7    examples of how a particular person of skill in the art can

8    identify a baseline and can achieve reductions below that

9    baseline.  They were not intended to be expressly limiting

10   except in the alternative instance where you feel that's

11   necessary.

12           But as a general matter, this idea that extrinsic

13   evidence is irrelevant is, I think, just not borne out at all

14   by the cases and, in particular, I had not seen -- sorry.  My

15   slides are moving on without me so I'm just going to pause them

16   here.

17           I have not seen the case that he's cited in the

18   slides, the *Seachange* case.  I looked it up briefly before the

19   hearing.  It's a case about just claim construction in general.

20   How you don't import limitations if they're not supported by

21   the extrinsic record.  In general, we agree with that concept,

22   as we'll talk about a lot more later.

23           But in just a quick search, there's a case out of

24   Delaware, 14 F.Supp.3d. -- I didn't get the entire site.  I

25   apologize.

1          But there are cases that talk about how extrinsic

2     evidence is essential to an indefiniteness inquiry because you

3     have to evaluate what a person of skill in the art would know

4     since you're evaluating what provides a reasonable certainty to

5     that person of skill in the art.

6          So to one of the questions you asked Mr. Herriges

7     about the fact question, I think the knowledge of a person of

8     skill in the art, the understanding of a person of skill in the

9     art is a fact question that defendants have to establish by

10    clear and convincing evidence and that is why the testimony of

11    Mr. Alberth, particularly the portions of it that were

12    unrebutted, that a person of skill in the art would understand

13    the low PAPR to be one below that baseline.  It has to be

14    significant weight and their contrary -- or I guess lack of

15    contrary rebuttal testimony means they can't meet that clear

16    and convincing evidence burden to dispute that factual

17    understanding of a person of skill in the art.

18         THE COURT:  So how is somebody reading the patent

19    supposed to know that that's what low means in this instance

20    and not something lower than just slightly below the baseline?

21         MR. STEWART:  Your Honor, I think that goes back to

22    Mr. Alberth's testimony that this is a commonly understood term

23    in the art.  And that's why I cited those instances from the

24    declaration of Volkswagen's expert where people in the art use

25    this term regularly.  They already understand what that you're

1    seeing to achieve in lowering PAPR, especially within an OFDMA

2    system is reducing it below that Baseline.

3        The references to power efficiency in the patent view

4    the person reading it to, okay, this is -- they're trying to

5    achieve a low PAPR for the same reasons that are common to a

6    person of skill in the art in these types of systems and the

7    way they do that is by reducing it below that threshold to not

8    have to redesign the power amplifier.

9        So you start with the patent and it's teaching -- I'm

10   sorry, Your Honor.  It looks like you might be speaking.

11       THE COURT:  (Zoom audio muted.)

12       MR. STEWART:  But you're on mute.

13       Your Honor, I apologize.  I can't hear you.  You're on

14   mute.

15       THE COURT:  Thank you.  I want to understand the

16   difference between your argument about whether this would be a

17   term that someone with the ordinary skill in the art would

18   understand versus its plain and ordinary meaning.  So are you

19   saying the plain and ordinary meaning with low is that its

20   below the baseline or are you saying that only a person of

21   ordinary skill in the art would be able to know that in this

22   specific context that's what low means?

23       MR. STEWART:  I think, Your Honor, I would say the

24   plain and ordinary meaning to a person of skill in the art is

25   that low in this context means lower than the baseline.

1          THE COURT:  Why is it that NEO abandoned this in the

2     other patent cases that have been cited?

3          MR. STEWART:  Your Honor, I can't actually tell you

4     the exact reasons why.  I can tell you that those abandonments

5     are irrelevant and they're different applications for different

6     patents where for any number of reason, strategic or otherwise,

7     the patent team might have determined just not to fight that

8     particular term or they might have abandoned the application

9     that included that term for reasons completely unrelated to the

10    PAPR term.  I honestly at this point can't speculate as to the

11    reasons why.

12         But I can tell you -- and it's cited in that slide

13    that I have here on the screen, also from that Cimini

14    declaration, is that when issuing the '366 patent, the patent

15    we are talking about, the examiner cited the low

16    peak-to-average power ratio in the time domain term as one of

17    the reasons for allowance.

18         So at the time of the '366 patent's issuance that

19    examiner understood the term and, in fact, even cited there is

20    a reason for allowance.  So the fact that other examiners doing

21    a less searching inquiry without the benefit of expert

22    testimony in a complete record that you have before you here,

23    initially rejected that term just has no bearing on the inquiry

24    in this particular case for this claim in view of this full

25    record that we have.

1          But it definitely was not an acquiescence.  I can at
2     least tell you that much.
3          THE COURT:  Go ahead.
4          MR. STEWART:  My colleague just pointed out to me
5     there's a case from the federal circuit called *Salazar* where it
6     holds that "silence in prosecution is not automatically
7     acquiescence."
8          So to the extent the Court wants authority for
9     understanding that concept, it would be the *Salazar* case in the
10    federal circuit.
11         THE COURT:  I mean, I'll take a closer look at this.
12    But I think they were saying it was more than silence but
13    actually removed the terms and agreed with the claim of
14    choice.
15         MR. STEWART:  In one instance I think that's right,
16    Your Honor.  But still, removal of the term just to sort of
17    move through the prosecution and determine that you didn't need
18    that for allowability or for novelty is not the same as
19    acquiescing to it being indefinite.  Right?  It is still silent
20    as to the merits of the indefinite inquiry and that is why it
21    is not acquiescence in the conclusion.  It was a decision
22    simply to just not have that fight for that particular patent.
23    So that's why we don't think that has any bearing on the actual
24    definiteness of the term in this patent.
25         Finally, Your Honor -- yeah, I think that covers about

1    everything that I wanted to say Though I went a little out of

2    order.

3          The final thing I'll say is that this expert testimony

4    that we're talking about, this idea that you can evaluate the

5    low -- whether a PAPR is low relative to a baseline is not just

6    from our expert, Mr. Alberth.  It's also from defendant's own

7    technical expert Dr. Axl, as you can see on the screen where he

8    explicitly said that a person of person of skill in the art in

9    the field determines whether something is low by comparing the

10   PAPR from one signal to another signal.

11         So, again, even Dr. Axl is not saying you need some

12   additional information, some additional threshold of how much

13   lower than the baseline is low.  He said that you determine if

14   it's low by comparing it to another signal or to a PAPR

15   baseline.  So he is in a sense acquiescing to the same

16   construction that we're proposing here.

17         And the other citation here is to Dr. Cimini, the

18   technical expert in the IPR who uses the term low PAPR without

19   any additional caveats or clarifications or metrics.  Because

20   it is an understood term in the art.

21         So unless Your Honor has other questions, that's all I

22   have.

23         THE COURT:  No.  Thank you very much.  I appreciate

24   your argument as well.

25         And so I'm not sure if you all have budgeted rebuttal

1   time or not.  I'm assuming not because we have so much to go

2   through.

3          MR. HERRIGES:  Your Honor, if I can take one minute

4   with Your Honor's permission.  I think that I can wrap up any

5   rebuttal I have.

6          THE COURT:  I'll give you three minutes.

7          MR. HERRIGES:  The first point I want to make, Your

8   Honor, this idea that lower is the same as low is absolutely

9   wrong.  I mean, if they meant low, lower, they would have said

10  lower.  They specifically chose the word low and they can't now

11  walk that back.

12          And if it were the case that just being lower was

13  enough, they would have said.  Their alternative construction

14  is three below 12.  Not 11 below 12.  Not 11.9 below 12.  It's

15  low.  It's low.  It's not just lower.

16          THE COURT:  I mean, just to -- this starts to sound a

17  little bit nitpicky, but isn't relatively low the same as

18  lower?

19          MR. HERRIGES:  Relatively low as they use it,

20  perhaps, Your Honor, but it does not -- it still doesn't answer

21  the question because relative to what and how low is relatively

22  to low.  And I think maybe more importantly, relatively low is

23  not the same thing as lower, which appears to be what they're

24  arguing.

25          The second point is even if you accept all their

1    evidence as true -- and I'll focus on the Cimini declaration.

2          What Cimini said is that 3dBs -- and this is in

3    paragraph 54 of his declaration.

4          He says 3dBs could be low.  So now we've got one

5    expert saying 3dBs.  We've got another saying 9dBs and I have

6    Mr. Stewart saying it just has to be lower.  What all of this

7    says is there is no reasonably certain standard in the art.

8          And the idea that a skilled artisan would just know is

9    not enough for reasonable certainty here.  There needs to be

10   objective boundaries and because there aren't, the claim is

11   indefinite and we would urge Your Honor to find that.

12         THE COURT:  (Zoom audio muted.)

13         MR. HERRIGES:  I apologize, Your Honor.  You're on

14   mute.

15         THE COURT:  Thank you very much, Mr. Herriges.  I

16   appreciate your argument as well.

17         So let's move on, then, to the third set of terms here

18   that we have which is also from the '366 patent and I'm going

19   to quote that from claims one and 17.  And the terms are,

20   quote, a ranging sequence selected from the set of ranging

21   sequences.

22         And so according to what you had indicated to me

23   previously, we would then turn to Mr. Stewart to address this.

24   How much time would you like, Mr. Stewart?

25         MR. STEWART:  Your Honor, simply because I'll make a

1    few introductory remarks as part of this term, I think 10

2    minutes.

3              THE COURT:  Go ahead.

4              MR. STEWART:  I'll share my screen again.

5         (Slideshow displayed and shown throughout presentation.)

6              MR. STEWART:  The term we're talking about now is

7    selected from a set of ranging sequences.  As you know, we

8    propose that it doesn't require any plain and ordinary meeting.

9    I think your preliminary construction is consistent with that.

10   The defendants want to essentially limit the term "selected

11   from" to "selected by a particular entity", namely the mobile

12   station, from a set of ranging sequences.

13             So before diving in to the specific arguments, I

14   thought if we just talked about indefiniteness, I would

15   reorient a little bit more on the traditional claim

16   construction concepts that are going to come up in this term

17   and several others here on out.

18             A particularly important thing I think in this slide

19   on the screen, this sort of decision tree for claims

20   construction, is that the first step is always to determine is

21   there a plain and ordinary meaning to the term in view of the

22   specification.  That doesn't mean looking at whether there has

23   been disclaimer or disavow or lexicography or some sort of

24   narrowing of the well-understood meaning.  It's simply to

25   evaluate is there already a known meaning.  And sometimes in

1    certain cases you have to look at the patent specification just

2    to even be able to ascertain the claim meaning because the

3    words don't have a commonly understood meaning or, as quoted

4    here on the screen in *Embrex*, the construction of claims can

5    sometimes just be a way of elaborating the normally tersed

6    claim language.  Not to change the scope of the claims, but

7    just to make them more clear.

8           There are going to be a couple of terms we talk about

9    today that fall into that category where we're just elaborating

10   on the existing scope of the plain and ordinary meaning.

11          What you're more often going to see, though, is under

12   the guise of just interpreting the term in light of the

13   specification in the standard *Phillips Embrex* type way,

14   defendants are going to look at the specification and specific

15   embodiments in the specification and try to narrow the plain

16   and ordinary meaning to exclude something.  That can only be

17   done in two context -- and this is clear in federal circuit

18   law -- either in lexicography, which is quoted from *Phillips* on

19   the left -- where there's a clear definition and I don't think

20   we have any arguments in this case that that's happened.

21          Or on the right in the case of clear and unmistakable

22   disclaimer.  A clear disavowal that the patentee is entitled to

23   less than the full scope of the plain language.

24          So in all of these terms where we're looking at

25   particular descriptions in the specification or embodiments in

1   the specification to try to create a limitation and reduce the

2   scope of the claims, it cannot simply be for context.  You

3   can't simply look at the specification and say, "Well, I know

4   this has a plain meaning, but I need to look at it in the

5   context of the spec."

6          That is only possible if there's not a plain meaning

7   on the face of the term.  If you're trying to narrow the scope

8   of the term from its plain meaning, you're doing a disclaimer

9   and *Thorner* has said that that's an exacting standard.  It's

10  not probably too far off from the clear and convincing evidence

11  standard we talked about in the indefinite.

12         So that's just one thing I wanted to focus on briefly

13  as it comes up in a lot of these terms.  This is a recent case

14  from 2019, *Continental Circuits* cited in our briefing.  Our

15  firm is actually a part this case.  Where even in the face of a

16  single embodiment being disclosed throughout the entire

17  specification, even in the face of references to the invention

18  in discussing that embodiment, and I think they even

19  distinguished prior art by discussing the specific embodiment.

20         In the prosecution history, the federal circuit still

21  reversed the district court who imported that embodiment into

22  the claims when it was inconsistent with the plain meaning of

23  the claims which didn't have that limitation on the face.

24         So in recent cases especially, the most recent federal

25  circuit case on this matter, they've been very consistent that

1   the only time they look at the specification and embodiments in

2   the specification is like in these cases cited by defendants

3   where this is no plain and ordinary meaning or it doesn't carry

4   an accepted meaning for one of skill in the art.

5          So I apologize for waxing poetic there a little bit.

6   But the main point is in all of these materials we have to

7   understand whether we're actually interpreting a term that

8   doesn't have a clear or plain meaning in which case you maybe

9   can look at the specs if you have to to find guidance.  But

10  where you have a plain meaning that's well understood, you

11  cannot import a limitation from the specification, and it would

12  be legal error to do so unless it's clear and unmistakable.

13  They have to be words of exclusion and restriction not just

14  consistent embodiment descriptions that are consistent with

15  that limitation.

16         So with that preamble, the issue in this particular

17  claim with respect to "selected by" is relatively

18  straightforward.  The words "selected by" they're just like

19  "chosen from" or "coming from" a set of sequences.  They have a

20  plain and ordinary meaning that is unmistakable in the fact

21  that it does not specify an entity doing the selecting.  And

22  you can see that in just the structure of the claim itself

23  where -- this is claim 17 from the patent method claim.  It's a

24  method of transmission by a mobile station and then there are

25  explicit method steps that must be performed by the mobil

1   station such as transmitting the data signal, transmitting a

2   ranging signal, but then there's this wherein clause where

3   you're no longer describing the actual method steps performed

4   by the mobile station, you're describing characteristics of the

5   different components of the method.  And that is where you see

6   in that first wherein clause that the ranging signal is formed

7   from a ranging sequence selected from a set of ranging

8   sequences.

9        It's agnostic to whether it is selected by the mobile

10  station or by the base station and I think contrary to what

11  you'll see in the defendant's presentation, there is nothing

12  about random access that mandates that the mobile station has

13  to necessarily select that sequence in order to use it to form

14  the signal that the mobil station sends.

15       As Mr. Alberth says in his declaration, it's commonly

16  understood that the base station can send a particular sequence

17  and say, "Hey, if you want to connect to me, you need to use

18  this sequence."  And then the mobile station can still do every

19  step in this claim that it's required to which is use that

20  provided sequence to form the signal, transmit the signal and

21  otherwise -- the claim.

22       So as your preliminary construction knowledge is I

23  think this is entitled to plain and ordinary meaning.  It

24  should not be limited to just performance by the mobile station

25  because that is a reduction in the scope of the ordinary

1    meaning of this term and would require unequivocal disclaimer,

2    which is not present.  Even if the only embodiment explicitly

3    discussed in the spec shows the mobile station during this.

4           And that's all I have, Your Honor.

5           THE COURT:  All right.  Thank you very much.

6           And who would like to address this on behalf of the

7    defendants?

8           MR. DESAI:  Thank you, Your Honor.  This is Ankur

9    Desai at DLA Piper for the Toyota defendants.  I would like to

10   address this term.

11          THE COURT:  You may proceed.

12     (Slideshow displayed and shown throughout presentation.)

13          MR. DESAI:  Sharing my screen here.  Hopefully it's

14   coming up.

15          Your Honor, the issue presented here -- and you see

16   the term again that we've just been talking about a "a ranging

17   sequence selected from a set of ranging sequences."

18          The key dispute between the parties here is

19   really -- you know, and the parties agree to use this phrase to

20   represent the dispute here.  But the reality is there's not

21   disagreement about the meaning of this particular phrase.  I

22   think the parties agree on what selects mean and they agree on

23   what a ranging sequence means.

24          The focus of the dispute is how this phrase operates

25   in the context of the claim language and that's what I would

1    like to focus on.

2           In particular, NEO takes the position that it's

3    advancing plain and ordinary meaning.  But the reality is it's

4    brief is quite clear that its interpretation goes far beyond

5    that.  NEO's interpretation is, frankly, unlimited and abstract

6    and I'd like to focus on that.  I think this parting here is

7    the same one that Your Honor has likely seen.  We've

8    illustrated in both to the asserted claims on this slide.  And,

9    you know, the '366 patent claim's a mobile station.  You see

10   that in the preamble of claim one.  It ends with the "mobile

11   station comprising."  That was not highlighted on NEO's slide.

12   But that's critical.

13          The '366 patent does not claim some other entity.  It

14   does not claim the base station.  And the structure of the

15   claims accords and you see that in both of the asserted

16   independent claims.

17          In both preambles, we see that the communication is

18   going from the mobile station to the base station.

19          In the next clause of both claims we see the data

20   signal that is being sent to the serving base station.

21   Subsequently, the ranging sequence being transmitted to the

22   serving base station.

23          And it's in that context, Your Honor, that the nested

24   clause that we're looking at here is found.  And, you know,

25   that context makes a hundred percent clear that even though

1    this verb "selected" is a passive voice verb, the context makes

2    clear that that selection has to happen by the mobile station.

3    The reason is that it's the same ranging signal that is being

4    sent by the mobile station to the base station.

5              Now, by contrast NEO, as I say, is sort of in the

6    guise of plain and ordinary meaning advancing a abstract and

7    unlimited interpretation.  We've put a few selections from

8    their brief that really make this clear.  You know, all of

9    NEO's arguments and, frankly, their entire brief is directed to

10   selection by the base station.  But that's merely convenient

11   for NEO's infringement positions.  There's nothing in the

12   patent that could select -- you know, that could limit this

13   selection to the base station and NEO admits that.

14             I think NEO's position, as you see here on the screen,

15   is it doesn't matter who or what selects the ranging sequence.

16   They say that other entities could do so and they provide no

17   definition for that and the reality here, Your Honor, is there

18   are a finite number of ranging sequences and merely adopting

19   the plain and ordinary meaning without countering those

20   arguments by NEO or addressing them raises validity questions

21   that were not briefed by the parties.  You know, NEO's expert

22   refers to an example specification that I'll address further,

23   but in that example it's a selection between one and twelve.

24   And merely choosing a random number between one and twelve is

25   an abstract idea.  It is not patentable.

1        And, you know, reducing the claim language to that

2   degree of that abstraction is a serious problem as far as the

3   validity of this claim.  That interpretation, Your Honor, also

4   flies in the face of what the patent teaches.  And here we've

5   provided a -- really the only part of the specification that

6   addresses this issue.  It's abundantly clear.  It says the

7   mobile station chooses the ranging sequence.  It subsequently

8   uses that sequence to identify itself.

9        And, you know, defendants presented in our brief case

10  law to the effect that this sole embodiment is highly

11  indicative of the scope of the claims, that it is what a person

12  of ordinary skill would use to ascertain the scope of that

13  claim.

14       I'd like to address, Your Honor, the points that NEO

15  has made and NEO's counsel made in relation to the relevant law

16  here.  As a starting point, they make the point that, you know,

17  only if there's no plain and ordinary meaning can these, you

18  know, references to the specification become relevant and, Your

19  Honor, that's exactly the case.  Merely saying that they're

20  advancing the plain and ordinary meaning is not enough.  They

21  have not said what the plain and ordinary meaning is and the

22  only interpretation they've offered is, frankly, utterly

23  indefinite, as we showed on the previous slides.  Their brief

24  makes clear that they think that's selection by anyone or

25  anything.

1          You know, I'd also like to address the *Thorner* case.

2    That's one that NEO cited on the reply and we provided the full

3    quotation from *Thorner* here.  I would like to be clear that

4    from an analytical perspective, defendants do not believe this

5    is a Lexicographer exception issue and the reality is, you

6    know, as the *Thorner* case makes clear, it's the context of the

7    specification that matters here and that's the context that we

8    have provided.  You know, and again, as NEO's counsel said,

9    this is not an issue of disclaimer either.

10          Your Honor, this slide just shows visually what we've

11   been talking about here.  This shows the relevant language in

12   isolation.  You know, seeing this in the context of the broader

13   claim makes clear that the flow of communication has to be, you

14   know, from the mobile station to the base station.  We showed

15   that previously and we've just called out that the ranging

16   signal here is exactly the one that's referred to above that's

17   being transmitted by the mobile to the base station.

18          The ranging sequence forms that ranging signal.

19          THE COURT:  Is there another way that the ranging

20   signal could be selected?

21          MR. DESAI:  Your Honor, that's exactly what I would

22   like to get to next, and I think the reality is doing that

23   would pose a very significant technological problem.  That's an

24   issue that was addressed --

25          THE COURT:  Regardless of whether it poses a

1    technological problem, if there's another way that the ranging

2    sequence could be selected,  and this language does not

3    specifically say that this ranging signal -- I was saying if

4    this ranging signal can be selected by some way other than by

5    the mobile station, then why should the claim be limited as

6    you're suggesting that it should when the language itself

7    doesn't do that?

8           MR. DESAI:  Your Honor, the answer is it cannot be

9    selected in a way that identifies the mobile station which is

10   what the claim language requires the sequence to do.  And you

11   see that called out here on the screen.

12          Let me explain a little bit further.  I think

13   defendant's expert really highlights this in our -- in his

14   declaration that was attached as an exhibit to the brief.

15   NEO's expert has -- first of all, NEO's expert has no support

16   for their position in the intrinsic record and as a result

17   looks to an unrelated specification, something that is not at

18   issue in this case.

19          What they point to is a preamble signature.  That

20   preamble signature is selected by another entity, but it does

21   not identify the mobile station and indeed it cannot.

22          And just going back, that's exactly what this sequence

23   needs to do in the context of the claim language.

24          Now, by contrast, that same technical specification

25   does include a signature that does identify the mobile station

1    and that is selected by the mobile station.  Indeed it has to,

2    Your Honor.  That selection by the mobile station is necessary

3    in order for that signature to be able to identify the mobile

4    station.

5         I would just reiterate, Your Honor, that there is a

6    broader issue.  And, again, this is seen in NEO's expert

7    declaration and we've highlighted the language here at least.

8         All of the arguments both in NEO's brief and by their

9    expert are directed to this possibility that a base station

10   could do this selection, but that's not NEO's position.  And as

11   we've made clear and as is shown here on the slide, their

12   position is that any other entity could make that selection.

13   The reality is that the patent provides no description

14   whatsoever of how another entity could make that selection in a

15   manner that identifies the mobile station.

16        This presents, as I say, a technological problem, but

17   also, as alluded to before, a validity problem as far as sort

18   of the broad and abstract scope of that type of selection.

19        The reason -- and I'll briefly sort of elude to the

20   technology tutorial that we provided Your Honor previously,

21   both the high level and the patent specific technology

22   tutorials.  The '366 patent talks about random access, Your

23   Honor, and as we gave the example previously that random access

24   occurs, for example, when a user turns on a mobile phone after

25   their plane has just landed, that is the process by which

1    connection is established for the first time.

2           And so the reason that NEO's proposal is really a

3    problem from a technological perspective, is there is no

4    previous communication that can be relied on here.  If some

5    other entity is making the selection, there's no way for that

6    other entity to provide that information to the mobile station,

7    which, again, the claims make clear, the mobile station is the

8    entity that must then ultimately send the ranging signal.

9           So without that missing link, there is no written

10   description for that proposal.  As we showed previously, the

11   written description that does exists stands squarely for

12   the -- it is one sentence and it says "the mobile station

13   chooses the ranging sequence."

14          And just to make it clear, the '366 patent, you know,

15   accords with this.  The '366 patent is describing this random

16   access process and it agrees -- you know, the language of the

17   patent is clear that it is talking about establishing that

18   communication in the first instance.

19          THE COURT:  And are there some instances in which,

20   let's say the cell tower could send out the ranging sequence of

21   some kind that the mobile device would receive?

22          MR. DESAI:  Your Honor, it's possible and it would be

23   an invention that is not claimed by the '366 patent.  It is

24   nowhere --

25          THE COURT:  I know they're not claiming that.  I don't

1    suggest that they're claiming that.  I'm just suggesting that

2    they may want to have what they are claiming be able to form a

3    ranging signal from a ranging sequence that's selected by

4    something other than their own mobile station.

5        MR. DESAI:  Your Honor, I think there are a number of

6    ways to articulate the problems with that solution, but we

7    think the written description is the clearest one.  There is no

8    written description whatsoever of what that process would be.

9    If another entity is to make that selection, that selection

10   needs to then be consistent with what the claims do require,

11   which is that the mobile station subsequently sends the ranging

12   signal.  So I think Your Honor is correct that that selection

13   is a possibility.  What's missing and what NEO's brief does not

14   explain and does not even attempt to explain is how that entity

15   subsequently conveys that ranging sequence to the mobile

16   station.  And that's the written description problem that would

17   be posed if Your Honor were to accept the, you know, broad

18   interpretation that NEO is advancing here in the guise of plain

19   and ordinary meaning.

20       THE COURT:  All right.  Well, this written description

21   may be a different issue, but perhaps Mr. Stewart will address

22   that.

23       Is there anything further you wish to add, Mr. Desai?

24       MR. DESAI:  Your Honor, I would just conclude, as you

25   say, the written description problem is an issue which the

1    parties have not briefed is the validity issue that I think is

2    posed if NEO's interpretation is accepted without further

3    clarification.  The mere selection of a random -- a number

4    between one and ten is simply an abstract idea, and NEO's brief

5    makes clear that that's what they propose.  Furthermore, that

6    that selection can be made by anyone or anything.  That is not

7    a patentable subject matter.

8              Thank you, Your Honor.

9              THE COURT:  Thank you, sir.

10             All right.  Would you like a few minutes, Mr. Stewart?

11   I'll give you three minutes.

12             MR. STEWART:  Thank you, Your Honor.  First the claim

13   language that is selected from -- if you say in a patent that

14   a, you know, a hammer head is made of metal, it's not

15   indefinite.  It doesn't have a 101 problem, it doesn't lack

16   written description because a person skilled in the art of

17   hammers understands what it means for them to be made of metal

18   without understanding who the manufacturer was of the

19   particular metal head that is on the hammer.  I think it has a

20   plain meaning to just say select from, regardless of specifying

21   the particular entity during the selection.  We have identified

22   --

23             THE COURT:  Now, how do you address the sort of

24   syntactical arguments that have been made that when you read

25   this, it looks as if you are talking about a mobile station

1    selecting the ranging sequence?

2         MR. STEWART:  Your Honor, I think that goes back to

3    the point I made on my opening remarks.  When you look at the

4    claim structure, it's actually the opposite.  The syntactical

5    structure of the claim has specific language when it's

6    identifying what the mobile station is doing.  The method

7    comprising the mobile station transmitting or a particular

8    signal or transmitting a ranging signal.  When it talks about

9    the selection, it doesn't do so.

10        It knows how -- in the same claim it knows how to

11   structure a syntactical phrase that would have said "the method

12   comprising the mobile station selecting a sequence from a range

13   of sequences."  And instead of using that language it opted for

14   the more passive, using a signal or -- or sequence that is

15   selected from a set of sequences.

16        Mr. Alberth has explained that there are multiple ways

17   to do it.  They quibble with the particular evidence he cited,

18   but they don't dispute his overall point, which was that a

19   person that's skilled in the art would have known that the base

20   station should do the selecting.

21        And the other arguments you heard from Mr. Desai were

22   really infringement arguments.  He's saying it might be hard to

23   show infringement of the claim if it's the base station doing

24   the selection instead of the mobile station.  That's not a

25   claim construction issue and it's the same thing with his

1    written description argument, which is sort of another semantic

2    thing in a lot of their arguments in this case.  That's a

3    defense that they have to meet by clear and convincing evidence

4    and present to a jury based on the terms that are properly

5    construed with the plain and ordinary meaning.  We are ready to

6    meet that challenge.  We think all the instructions that we

7    proposed are adequately described.  But the fact that there

8    might hypothetically be a written description argument they

9    raise somewhere down the road based on the claim construction

10   is not a reason to depart from the plain meaning of the term.

11        THE COURT:  All right.  Thank you very much, sir.

12        So our next term that we have here is from the '908

13   patent and it has the following terms that I'll, quote:

14   "Wherein the portion of the frequency band used for

15   transmission of the random access signal does not include

16   control channels."

17        And so the parties take different positions with

18   respect to this language.  And so would that be Mr. Stewart

19   again addressing this?

20        MR. STEWART:  Yes, Your Honor.  That's me again.

21        THE COURT:  How much time?

22        MR. STEWART:  I'll hand off the mic eventually.

23        THE COURT:  How much time do you need?

24        MR. STEWART:  This one I think, five minutes.

25        THE COURT:  Go ahead.

1          (Slideshow displayed and shown throughout presentation.)

2          MR. STEWART:  So one more time sharing my screen.

3    Your Honor, you identified the dispute accurately.  The

4    question is really whether when the patentee said "control

5    channel" did it actually mean "control information?"  Because

6    when you really look at the defendant's proposal, they define a

7    control channel as a channel care and control information, but

8    that really just collapses in on itself.  And what they're

9    saying is that if the random access signal overlaps with

10   control information at all, it would not infringe this claim.

11         So by narrowing the scope -- sorry.  Broadening the

12   scope of this negative limitation, they're essentially

13   narrowing the scope of the claim as a whole.

14         The obvious reason -- the straightforward reason why I

15   think the Court's construction is right to not import this idea

16   of control information into the claim language is that control

17   channel is a commonly understood term in the arts.  Mr. Robert

18   said so.  Their own high-level technology tutorial said so.

19   They explained that when the base station communicates with the

20   UE, it groups defensive information into channels based on the

21   type of information.

22         So in their briefing, they bemoan this idea of a

23   primary purpose test that we're allegedly placing.  But we're

24   importing no such test.  We're just using what they admit is

25   the common understanding of a person skilled in the art, mainly

1   that wireless communication systems contain channels that are

2   grouped based on the type of information.

3         There is often -- "frequently used channels include a

4   physical downlink control channels."

5         There are also uplink control channels, et cetera.

6   The point being that a person skilled in the art would know

7   that a control channel is an actual thing.  An actual channel

8   designated for control information in a wireless communication

9   system and would not just encompass any sequence that has

10  control information.

11        The upshot, right.  The reason they want this is

12  displayed on this slide.  The red is intended to designate a

13  hypothetical control channel, an actual control channel where

14  the red is fully control information.  The green is a

15  hypothetical random access signal.  The claim requires that the

16  green random access signal not overlap with the frequency band

17  used for control channels in the red.  If instead the term is

18  broadened to just any control information, then as you can see

19  on this slide, if there's one red dot in the portion of the

20  frequency where the green is, that contains one single piece of

21  arguable control information, then the defendants are avoiding

22  infringement.

23        So that's why they want this, it's an extensive

24  narrowing of the claim language and we think you should just

25  adopt the plain and ordinary meaning.

1          The only comment I make about the proposed preliminary

2     construction by the Court is that while we do agree that this

3     is a control channel, it's not just control information and

4     your proposed construction isn't really something we would

5     dispute on its face.  We agree that this would be a

6     multi-carrier control channel.  We do just generally oppose the

7     importation of any limitations from the speculative purported

8     embodiments into the claim language.  So we would oppose the

9     inclusion of the MC, multi carrier control channel not because

10    it's a really a substantive issue that matters for this term,

11    but because, you know, matters more for other terms and it's

12    part and parcel with this idea that even if the specification

13    specifically talks about a multi-carrier control channel in the

14    embodiments, there is no clear construction (phonetic) to this

15    claim.

16          And that concludes my argument, Your Honor.

17          THE COURT:  Can you clarify exactly -- are you saying

18    that you agree with the proposed construction of the Court or

19    you would amend it in some way?

20          MR. STEWART:  Your Honor, we would prefer it would

21    just be plain and ordinary meaning.  That the control channel

22    already had its own meaning and it's well known to a person

23    that's skilled in the art and no modifiers need to be at all.

24    So we would oppose the addition of multi-MC, multi-carrier in

25    front of the words, "control channel," but as a substantive

1    matter in this particular term, I'm sort of alerting you to the

2    fact that that's as significant as it might be in other issues.

3          (Court reporter imposes clarification.)

4          THE COURT:  Thank you very much, Ms. May.

5          And so who would like to respond to this argument

6    regarding the issue of control channels?

7          MR. DESAI:  Your Honor, Ankur Desai for the Toyota

8    defendants.  I'll respond here as well.

9          THE COURT:  Okay.

10   (Slideshow displayed and shown throughout presentation.)

11         MR. DESAI:  Once again, just sharing my screen.  I'll

12   skip ahead to the slide for the term at issue here.  I think,

13   Your Honor, in light of the Court's preliminary construction,

14   I'd like to make my comments brief and primarily respond to

15   what I heard NEO's counsel say here.

16         I think the crux of this issue and the key dispute as

17   you see on the slide is simply whether the ordinary meaning of

18   control channels is, as defendants have proposed, channels

19   carrying control information.

20         Our brief, Your Honor, we provided authority.  This

21   issue has been litigated in precisely the same technology space

22   and the construction found there is exactly what defendants

23   have proposed, the finding by the board, by the Patent Trial

24   and Appeal Board that a control channel is a channel that

25   carries control information.

1         Your Honor, I apologize.  I need to move forward

2    slides here.  I'll just say briefly, NEO's counsel cited the

3    *Embrex* case.  We think that's an appropriate case to cite here

4    and what that case said is it referred to terse claim language

5    and that a construction is appropriate where, you know, that

6    construction merely articulates that plain and ordinary meaning

7    and that's exactly what defendants propose to do here.

8         And, frankly, we don't disagree with the preliminary

9    construction.  I think what you see in the briefing and what

10   you heard NEO's expert talk about was a primary purpose.  That

11   is not embraced in the preliminary construction and to the

12   extent that that is not a part of the Court's interpretation of

13   this term, we agree with that preliminary construction.

14        I think we explained in our briefing and I may have

15   misheard NEO's counsel, but I believe they characterized

16   defendants' position as agreeing with this.  I just would like

17   to clarify.  That's not the case.

18        NEO's expert provides no basis for this primary

19   purpose naming convention.

20        NEO's expert also does not refer to any extrinsic

21   evidence that would support that convention.  What NEO's expert

22   does refer to is a unrelated specification, and defendants

23   showed in our briefing that specification squarely disproves

24   that supposed naming convention.  According to Mr. Alberth, a

25   shared channel is used primarily to send data, and a controlled

1  channel is used to send primarily control information.  But the
2  specification that they have cited in their brief is pretty
3  clear it contains a data channel.  According to Mr. Alberth,
4  that ought to be named a shared channel.  It also contains a
5  shared control channel.  That supposed naming convention really
6  falls apart in light of that.
7          So, again, to the extent that that primary purpose
8  test is one that the Court has not embraced in its preliminary
9  instruction, we felt it is an appropriate construction.
10         THE COURT:  All right.  Thank you very much,
11  Mr. Desai.  And I don't know if you feel it's appropriate to
12  respond at all, Mr. Stewart, but I'll give you a minute or so.
13  Go ahead.
14         MR. STEWART:  Your Honor, the only thing I would say
15  is we're not -- we weren't imposing a primary purpose test,
16  again, and I don't think the Court's construction bears on that
17  at all.  It's simply acknowledging, in our opinion, that a
18  person of skill in the art knows what a control panel is.  The
19  labels apply to channels and while the communication system
20  throughout the prior art, called themselves control channels
21  and that's what we're talking about in the patent.
22         That's all I have to add.
23         THE COURT:  All right.  We've been going for about an
24  hour and a half.  I think it might be appropriate to take a
25  brief recess here.  So it's about 11:27.  Let's try and be back

1    in five minutes or so.

2          THE LAW CLERK OF THE COURT:  The Court stands in

3    recess for five minutes.

4          (At 11:28 a.m., off the record.)

5          (At 11:35 a.m., back on the record.)

6          THE COURT:  All right.  Let's get started here.  And

7    so Mr. Weissburg, you can call the Court in session.

8          THE LAW CLERK OF THE COURT:  Please rise.  The United

9    States District Court for the Eastern District of Michigan is

10   back in session.  The Honorable Terrence G. Berg presiding.

11         THE COURT:  Good morning again, everyone.  So we took

12   our break about five minutes ago and we're back on the record

13   here in our claim construction hearing.  We just finished the

14   fourth term that was contested here.  And now we're going to

15   address the fifth term.  This is a term that is also from the

16   '908 patent in Claims One and Two as well as Nine and it's just

17   the term "associated with."  So associated with, end quote.

18         So I'm not sure which counsel would like to address

19   that.

20         If you would like to move forward, Mr. Stewart.

21          MR. CASSADY:  Your Honor, can I -- this is

22   Mr. Cassady.  If I can just have a housekeeping thing real fast

23   with Your Honor, if I could?

24         THE COURT:  Go ahead.

25          MR. CASSADY:  Your Honor, as was mentioned earlier in

1    the hearing, I've got another hearing tomorrow I need to travel

2    for.  I just wanted to ask your permission to leave the hearing

3    when I need to leave.  I didn't want to do it without your

4    permission, Your Honor.

5            THE COURT:  No, that would be fine.  I understand that

6    there are a lot of counsel here in the hearing.  So you are

7    certainly excused.

8            MR. CASSADY:  Thank you, Your Honor.  Thank you.

9            MR. STEWART:  Thank you, Your Honor.  And this is

10   Chris Stewart again.  I will be addressing the next term.  If I

11   can briefly -- I understand it will count against my time.  If

12   I could jump back to the first term, the low PAPR term, for one

13   brief moment.  There was discussion about silence and acquiesce

14   in the other applications where the term was objected on the

15   grounds of indefiniteness.

16           During the break we looked at the record really

17   quickly and I just wanted to put on the record that canceling

18   those claim and amending the claims to remove the low PAPR

19   dispute, NEO expressly said in its remarks in the prosecution

20   that the applicant disagrees with the examiner, but is making

21   these amendments in order to advance prosecution.  I just

22   wanted to make sure the record is clear we did explicitly

23   disagree with those and not acquiesce to those.

24           THE COURT:  Thank you very much.

25           MR. STEWART:  All right.  May I proceed on the

1    "associated with"?

2            THE COURT:  Go ahead.

3            MR. STEWART:  Thank you, Your Honor.  Associated with,

4    the dispute here, as you can see on the screen, is whether we

5    clearly and unmistakably narrowed the plain words "associated

6    with" to mean identifying.  We agree with Your Honor's

7    preliminary construction that to the extent there was any

8    disclaimer whatsoever, it is simply a disclaimer of the fact

9    that "associated with" cannot merely mean "assigned by".

10           The MAC ID that was identified in *Walton* in the PTAB

11   assigned by the base station, but it was associated with a

12   different entity, the UE, the immobile station not the base

13   station.

14           So if there is going to be any disclaimer, it should

15   definitely be limited to just that.  That associated with means

16   more than merely assigned by.  It does not, however, need to be

17   further limited to this idea of identifying.  And the reason is

18   that, first of all, it's just identifying as narrower and

19   inconsistent with the plain meaning of associated with.

20           Even defendants I think in their brief implicitly

21   acknowledge that associated with is broader, and they have to

22   resort to disclaimer and accuse us of prosecution history

23   disclaimer in order to narrow it to what they want to do, which

24   is identifying.

25           The one reference to it in the specification that

1    defendants point out talks about a code or sequence that is

2    designated to the corresponding base station.  That also is

3    less stringent or restrictive than this idea of identifying

4    because the sequence can be designated to that base station.

5    It might not be necessarily uniquely designated to only that

6    base station in a way that would be uniquely identifying of

7    that one against all others.

8           So even the usage in the specification allows for a

9    broader understanding of this term than merely identifying.

10          And then when you look at the statements made in the

11   IPR before the PTAB the defendants only show you in their

12   briefing this one statement where we're talking about the term,

13   "identifying."  The user terminal or the MAC ID is used to

14   identify the user terminal and not the base station.  But if

15   you look at the brief as a whole or the statements made as a

16   whole, it is just peppered with this primary argument, which

17   is, as you can see in the top left, that the MAC ID is at most

18   associated with the user terminal, not the access point.

19          The MAC ID is associated with the user terminal, not

20   the access point.  When *Walton* refers to the user terminal

21   assigned MAC ID, it's referring to a MAC ID associated with the

22   mobile station, not the base station.

23          The point we're getting across over and over and over

24   again, unmistakably was simply that the MAC ID in *Walton* was

25   associated with the wrong element.  As evidence of that

1   association, the fact that it was associated with the user

2   terminal, we referenced what *Walton* itself talks about.  I

3   think it would be in one of the defendants' slides, they show

4   the portion of the *Walton* reference, where *Walton* talks about

5   the MAC ID being used to identify the user terminal to the base

6   station.

7           So in rebutting, responding to that *Walton* reference,

8   our expert and our IPR counsel talked about identifying as a

9   way of explaining why it's associated with the wrong entity.

10          So, for example, they say it's associated with the

11  base station.  We say no, it's associated with the user

12  terminal.  See, *Walton* says that the MAC IDs is useful for

13  identifying the user terminal, not the base station.

14          So when you're talking about clear and unequivocal

15  disclaimer, simply using the language of the prior art to

16  explain why that prior art doesn't meet the plain meaning of

17  the claim limitation is not a clear and unequivocal disclaimer

18  or that you're trying to narrow the definition of the words in

19  your patent to match the language that just happens to be used

20  by this one prior art reference.

21          In sum, the fact that we talked about identifying, if

22  at all, was solely just evidence of the way that *Walton*

23  explains the relationship between the MAC ID and the user

24  terminal, which was inconsistent with the claims that require a

25  relationship between the given sequence and the base station.

1    Associated with was still the focus of the argument, it's still

2    got a plain meaning all by itself.  It doesn't need any further

3    construction.

4           THE COURT:  Thank you very much, sir.  Who would like

5    to respond regarding this term?

6           MR. HUGUENIN-LOVE:  Good morning, Your Honor, I'm

7    James Hugenin-Love representing GM and I'll respond on behalf

8    of defendants on this term.

9           THE COURT:  Go ahead, sir.

10          MR. HUGUENIN-LOVE:  May it please the Court, I'll

11   start with Slide 61.

12      (Slideshow displayed and shown throughout presentation.)

13          MR. HUGUENIN-LOVE:  This is a slide showing what the

14   key dispute is here and that's whether NEO should be held to

15   its IPR statements that associated with requires identifying.

16   We don't think that the preliminary construction goes far

17   enough because we don't think that it captures the full effect

18   of NEO's IPR statements.

19          And I heard Mr. Stewart comment about there's a

20   primary argument that they had.  Yes, they made a primary

21   argument, but then they went further and they said -- made more

22   arguments in order to distinguish why this MAC ID was not

23   associated with the base station.  And in order to give full

24   effect to this particular term, I think it's important to look

25   at these other statements.

1          So turning to Slide 62, we can just jump right in to

2     the IPR.  I think it's important to focus first on what Dell

3     said in order to understand how narrow NEO interpreted the term

4     "associated with," in order to overcome *Walton*.

5          On the Slide 62, we see the base station and, yes, it

6     assigns this MAC ID.  It's a private MAC ID to the user

7     terminal.  And so that this user terminal can use the MAC ID to

8     identify itself with this base station and only this base

9     station.  And because it identifies itself to this base station

10    and only this base station, not any other base stations, Dell

11    made the argument this MAC ID is therefore associated with the

12    base station.

13         Again, a sequence can be associated with multiple

14    things.  It's not limited to an either/or proposition like NEO

15    wants it to be.  Particularly Dell cited from, quoted Paragraph

16    122 among other paragraphs, where *Walton* says that this user

17    terminal registers with the access point, the base station, at

18    the start of a communication session and is assigned a unique

19    MAC ID by the access point.

20         And that MAC ID is used to identify the user terminal

21    during the session.  So it's clear that this MAC ID, again, is

22    what the user terminal used to identify itself with this

23    particular base station.  If it were trying to identify itself

24    to another base station, that other base station wouldn't know

25    who that user terminal is or anything because only one

1  particular base station assigned that MAC address -- or MAC

2  ID.

3        So what did NEO say in response to Dell's arguments?

4  And I think this is the part of the NEO's IPR statements that

5  weren't captured by the preliminary -- by the preliminary

6  construction.

7        So what did NEO say?  NEO said, well, *Walton* teaches

8  that the purpose of its MAC ID is to identify the user

9  terminal, not to identify the access point that made the

10 assignment.

11        Therefore, they made the conclusion that the MAC ID is

12 associated with the user terminal rather than the access point.

13        Now, NEO could have ended their argument in the IPR,

14 they could have just said, you know, we don't think that the

15 MAC ID is associated with the base station because it's

16 assigned by the base station, but they didn't.  They went

17 further and they used this express word "identify."  And this

18 bright-line rule between what's associated and what's not

19 associated with something.

20        Well, it's whether it identifies that something.

21        Mr. Alberth, the expert that NEO used in the IPR and

22 the same expert that they're using in this district court

23 litigation agreed with NEO, and he said, "Knowing the MAC ID

24 does not allow for identification of the access point."  He

25 used the same word.

1          And he said, "Therefore, the MAC ID is not associated

2     with the base station," using the same identification language

3     that NEO was arguing.  And that was Slide 65.

4          So to NEO's credit, this argument the PTAB found

5     persuasive.  In particular, they found this identified language

6     particularly persuasive, and Mr. Alberth's declaration

7     testimony, that a MAC ID is used to identify a user terminal.

8     So, therefore, *Walton*'s MAC ID is associated with the user

9     terminal, not *Walton*'s access point.

10          So we have NEO's IPR statements, we have NEO's expert,

11    and then we have the PTAB all agreeing and finding persuasive

12    that the argument that the MAC ID is used to identify a user

13    terminal, is what ultimately overcame the *Walton* reference.

14    Because the MAC ID is associated with the user terminal and not

15    with *Walton*'s access point or base station.

16          So we think it's important that identify be part of

17    the construction required.  Because that makes sure that NEO's

18    held to consistent statements between what was said in the IPR

19    and now what is said in this district court litigation.

20    Because they shouldn't be able to point to a sequence like

21    *Walton*'s MAC ID or any other sequence in this litigation that

22    does not identify the base station as satisfying the claim.

23          Now, if I can just jump ahead to Slide 71, which

24    provides a federal circuit case.  This is *Technology Property*

25    *versus Huawei* case.  We think it's particularly instructive

1   here.  In that case the patentee made certain statements that a

2   prior art reference called Madgar (phonetic).  The patentee

3   made these statements that Madgar's oscillator is at a fixed,

4   not a variance frequency and relies on an external pistol

5   postulate.  And the federal circuit said, you know, maybe the

6   patentee didn't need to make those arguments to overcome

7   Madgar, but they did.  And the district court was correct in

8   construing the oscillator term to mean an oscillator whose

9   frequency is not fixed by an external crystal, using the words

10  the patentee used to overcome Madgar.

11          And particularly instructive I think for this case is

12  that the Federal Circuit said that the scope of surrender is

13  not limited to what is absolutely necessary to avoid a prior

14  art reference; the patentees may surrender more than necessary.

15  And when this happens, we hold patentees to the actual

16  arguments made, not arguments that they could have made.

17          So NEO could have limited their argument to what

18  Mr. Stewart said was their primary argument, but they didn't.

19  They went further and they said how to distinguish between what

20  is associated with something and what isn't associated.  That's

21  identifying.

22          If it identifies somebody, it's associated with.  If

23  it doesn't identify something, it's not associated with.  And

24  so we think that our construction, defendants' construction of

25  identifying, captures the full effect that NEO was making in

1    the IPR.

2              THE COURT:  Thank you very much, sir.

3              Is there any response to the arguments of

4    Mr. Huguenin-Love's argument?

5              MR. STEWART:  Yes, Your Honor.  This is Chris Stewart

6    again for NEO with a quick response.

7              That case that was just cited, the *Tech Prop* case from

8    2017, that was before the *Continental Circuits* case from 2019

9    that I cited in my earlier remarks about the exacting standard

10   for disclaimer and the *Continental Circuits* case explicitly

11   talks about the fact that merely criticizing the prior art by

12   reference to a particular embodiment of your invention or

13   comparing and contrasting your invention with the prior art is

14   not sufficient to create a disclaimer unless you make it

15   absolutely clear that you're disavowing all other scope.

16             So that just goes back to what I said in my opening

17   remark.  Slide 64 from the defendants said, "*Walton* teaches

18   that the MAC ID identifies the UE and not the base station."

19   They were comparing and contrasting in the context of this

20   specific embodiment of the sequence that was discussed in

21   *Walton*.  That doesn't mean that they were giving up all other

22   scope within the term of "associated with" other than

23   identifying.

24             The sequence associated with the base station could be

25   useful for identification.  It could be used in that process,

1    but that doesn't mean that it necessarily needs to uniquely

2    identify the base station, which seems to be what defendants

3    are propounding here in order to meet that claim language and

4    there was no disclaimer.

5             THE COURT:  Very good.  All right.  Thank you very

6    much.

7             So let's move on then, to the sixth term and that's

8    also from the same '908 patent, and in that case the term is

9    "both random access signal,"  and it's found in claims one and

10   two, number four and six and nine.  So, I want to give each of

11   you time to address this as well.

12            So Mr. Stewart, are you going to address this or who

13   do we have?

14            MR. BLOMQUIST:  Hi, Your Honor, good morning.

15   It's John Blomquist here for NEO.  I'll be taking over for

16   Mr. Stewart on this term.  My understanding, I've been told by

17   my co-counsel that we are arguing -- in the interest of time,

18   we're arguing this term along with the related dispute over

19   probing signal in the PR 2 patent.

20            THE COURT:  All right.  So you're going to address

21   random access signal from the '450 patent and then also the

22   probing signal from the '302 patent?

23            MR. BLOMQUIST:  That's right, Your Honor.

24            THE COURT:  Go ahead.  How many minutes do you think

25   you need?

1          MR. BLOMQUIST:  Hopefully 10 minutes, Your Honor, but

2     we do want to spend some time on this term for sure.

3          THE COURT:  Go ahead.

4          MR. BLOMQUIST:  Thank you, Your Honor.  Again, this is

5     John Blomquist for NEO Wireless, and the dispute for this term

6     and both terms in question here is really about the role of the

7     specification in construing random access signal and probing

8     signal.  But it's vitally important to begin with what is

9     undisputed in both of these cases, which is that -- oh, excuse

10    me.  I'm not sharing my screen.

11         There we go.  Can you see, Your Honor?

12         THE COURT:  I just see a black screen at this point.

13    (Pause in proceedings.)

14    (Slideshow displayed and shown throughout presentation.)

15         MR. BLOMQUIST:  Okay.  Thank you, Your Honor.  Again,

16    the dispute about this term is really about the use of the

17    specification.  But what's undisputed for both random access

18    signal and probing signal is that those terms, those terms in

19    question, convey general concepts that were well-understood at

20    the time of the invention.  Again, using a signal for random

21    access or for channel probing, those are things that were

22    understood.  The procedures were understood in wireless

23    communications and that's given with unrebutted expert

24    testimony in this case.

25         Again, Mr. Alberth is saying that both -- there's a

1    similar excerpt in his declaration for permanent signal because

2    it's true for both that they were extremely well-known terms in

3    the art at the time of the patent.

4            So, of course, the claimed elements in addition to

5    these specific terms in both patents that add, you know, a

6    novelty for a claimed invention.  But the specific term in

7    question here, "simply random access signal", has on its face a

8    well understood, unambiguous meaning in the art.  Once again,

9    this is not part of the dispute.  Not only is it unrebutted

10   again on the factual record here, but it's undisputed in terms

11   of attorney argument.

12       Defendants have used the term -- even today we saw a slide

13   for a different term, talking about random access signals

14   generally.  Again, to convey a general concept of a random

15   access signal, the random access procedure, and again, the

16   equivalent for channel probing.

17           And that's vitally important for this analysis because

18   the recent cases especially from the Federal Circuit all really

19   turn on using the specification for this sort or decisive or

20   definition of the language.  When the term is somehow uncertain

21   or ambiguous in its plain and ordinary meaning, basically, when

22   a POSITA would come to the claim term, would it be that they

23   have uncertain or unclear understanding of what that term means

24   in the art.

25           And that's simply not true here.  And in the first two

1    cases, the cases cited by the defendants in briefing.  Again,

2    the term in question has no plain and ordinary meaning,

3    therefore, we turn to the intrinsic record of the patent.  The

4    second case, the wireless hardly has a claim on there, meaning

5    therefore the specification language has the sort of decisive

6    significance.

7            And again, this World Class is just *World Class Tech*

8    *Corp.*, 769 F. 3rd, 1120.  It's just again another recent case.

9    Again, the claim language when it leaves uncertainty, in those

10   circumstances the terms and specifications resolve the

11   uncertainties.

12           Again, that's just not the case here.

13           Both random access signal and probing signal as

14   general concepts are understood in the art.  In fact, there's

15   not even evidence in the record that they have an understood or

16   useful meaning outside of this art of wireless communication.

17   These are terms that again convey specific concepts in the art.

18           So turning back now, with that understanding, the

19   dispute is whether the specification requires limiting or

20   excluding the scope of these well-understood terms, and, again,

21   this must be done through this claim.

22           And defendants make two primary arguments in support

23   that there has been this claim that we must narrow the terms

24   beyond, again, their well-understood meaning.

25           And the first is that it's a form of the argument that

1    the disclosure does not describe or use other signals for

2    random access or for channel probing.  But this splits the

3    entire disclaimer analysis on its head.

4         The appropriate analysis is not whether the term that

5    has a well-understood scope can include what -- again, what is

6    otherwise a plain and ordinary meaning.  It's not whether a

7    term can include it.  It's not the supposed absence of

8    disclosure that causes disclaimer.  That is all -- again, as

9    has been already foreshadowed, maybe potential written

10   description arguments supposedly from the other side.  But for

11   disclaimer in claim construction, it is an affirmative express

12   manifestation of intent that deliberately limits the scope of

13   the claims.

14        Again, if you otherwise have a plain and ordinary

15   meaning, you need those express statements in order to

16   disclaim.

17        So we turn to the defendant's second argument, which

18   is -- this is part of the '908 patent.  The '908 patent -- oh,

19   I'm sorry, Your Honor.  No, please.

20        THE COURT:  Random access signal I guess, if you look

21   at -- it's probably undisputable.  You're using it in a

22   specific way I think in light of the context of these claims.

23   Because they're being used at the access signal.

24        MR. BLOMQUIST:  Your Honor, when we talk about context

25   of the claims of the specification, we need to keep in mind,

1    again, some clear federal circuit law about even if you

2    describe only one embodiment or if a limitation is shared

3    amongst all of the embodiment, right.  That meaning of the

4    disclosure only in both of those scenarios describes things

5    with a certain limitation, for example, or provide the context

6    for a certain limitation, that doesn't mean it's proper to

7    import the limitation into the claims.  But it's specifically

8    not used.  And, again, that is especially true when otherwise

9    the term "random access signal" or "probing signal" has a

10   well-understood meaning.

11           So again, that is something that is -- I think it's on

12   the next slide here.

13           Yeah.

14           But again, it is simply when we talk about context, to

15   us that's almost a misnomer because really in order to alter

16   the scope of these terms, there needs to be a disclaimer.

17   Because you can't just, again, look at the embodiments or look

18   at the entire description and say, well, it's only described

19   this much; therefore, you are strictly limited to what's

20   described amongst the embodiments.

21           But they don't redefine the words.  Again, that is

22   something that is clear Federal Circuit law.

23           And again, we point to -- in the middle here, I

24   present another recent case, *Canedness Pharmaceutical*.  Just

25   again reiterating this point of law in the recent cases even if

1   all of the embodiments included a specific limitation, it would

2   not be proper to import those limitations.

3           And going to some of the statements that are in the

4   patent, which, again, were on the previous slide, Slide 21,

5   this is what defendants point to as the statements, the

6   affirmative statements that supposedly act as clear disclaimer,

7   and they do not.

8           Especially when looking at, for example, a case like

9   *Continental Circuits* where, again, just descriptions of the

10  present invention, they dealt with similar statements there, do

11  not cause clear disclaimer on their own.  And also from that

12  case, the teaching about the purpose of the specification to

13  fully describe in detail a particular mode of the invention and

14  particular embodiments of the invention, does not mean, you

15  know, fulfilling that purpose, in the Section 112, for example,

16  does not mean that you are, therefore, limited to just that

17  mode.  And again that is clear for that case as well.

18          But that analysis, Your Honor, is all just looking at

19  those statements from column two of the patents in a vacuum.

20  You must, of course, review the specification as a whole, and

21  that's what a POSITA would do when figuring out whether or not

22  there was a clear and deliberate intent to the inventors to

23  limit the scope of these otherwise well-understood terms.

24          And here are the examples from the patent of contrary

25  statements of those intentions.  You know, the detailed

76

1    description of the embodiments is not intended to limit concise

2    disclosure.  "The teaching of the inventions herein can be

3    applied to other systems, not necessarily the systems described

4    above.  The actual scope of the invention encompasses not only

5    the disclosing embodiment."

6            So this is not even a case where there is

7    specification language where it's solely uncontradicted that

8    the patentees or inventors intended to limit the scope of their

9    invention and the specification.  There is, in fact,

10   contradicting statements about that and, therefore, makes it so

11   it's not clear and unmistakable.

12           And so on top of that, Your Honor, you know, talking

13   about the fact that these terms have a well-understood meaning

14   in the art and, therefore, already hesitate to override that

15   meaning with context, for example, in the specification, we

16   have another piece of intrinsic evidence, which for the random

17   access signal term in particular is the claim eight of the '908

18   patent.

19           Again, we believe that this argument, our position is

20   correct, notwithstanding this, but this creates the strong

21   presumption confirming our position.

22           And the cases cited by defendants in briefing to

23   dispose of the claimed differentiation point, again, which

24   creates a strong presumption of a correct construction, is

25   simply not apt here.  They have not provided a case where its

1    disclaimer and that claim differentiation does not overcome

2    that.  And especially in this case, where they're not.  They're

3    arguing, for instance, that it's just context from the

4    specification that should be imported.

5         THE COURT:  Can I just ask you, if you -- as this

6    paragraph eight said, it's citing here:  "A random access

7    signal is a spread spectrum signal," why would you object to

8    random access signal -- (indiscernible.)

9         MR. STEWART:   I apologize.  Can you repeat the

10   question, Your Honor?  I think I missed the last part of your

11   question.

12        THE COURT:  I said the slide that you have up right

13   now says that the random access signal is an spread spectrum

14   signal."  So why would you object to the construction of random

15   access signal that does just that, when it says the same thing

16   that this slide says?

17        Mr. BLOMQUIST:  Well, there are two points there, Your

18   Honor.  So, first this is claim eight, the dependent claim of

19   claim one.  So the presumption that is from the existence of

20   this claim, in order to not read as superfluous, would be that

21   the random access signal that's being modified by this language

22   in Claim Eight is presumptively broader.  So that the random

23   access signal includes in it, scope that is not just a spread

24   spectrum signal.  And on top of that, Your Honor, to be clear,

25   we wouldn't even agree necessarily that this is adopting a

1  direct sequence spread spectrum signal.  This is just a spread

2  spectrum signal, which, again, might be different in scope,

3  presumable broader in scope than even a direct sequence signal.

4        So that's, again, why we believe -- we oppose the

5  construction of the intentionally broader Claim One, the

6  independent claim on which this depends.

7        And so with that, Your Honor, I believe that's all the

8  argument I have for these terms and we appreciate your time

9  today.

10        THE COURT:  Very good.  Thank you very much, sir.  So

11  let's see, from our defendants, who would like to respond?

12        MR. CORDELL:  Good morning, Your Honor.  I think it's

13  still morning, Ruffin Cordell from Fisher Richardson on behalf

14  of Honda.  And I'll be presenting.  Let me see if I can share

15  my screen.

16    (Slideshow displayed and shown throughout presentation.)

17        MR. CORDELL:  Can you see that okay, Your Honor?

18        THE COURT:  Yes.  Thank you.

19        MR. CORDELL:  Yes.  I'm here to respond to the RAS or

20  random access signal terms, and what I've got up on Slide 76 is

21  I took a little liberty, Your Honor, and I put Your Honor's

22  proposed construction or preliminary construction in the slide

23  rather than what we had had because, frankly, we like it

24  better.  You took what we had put in, which was kind of a

25  incomplete thought and you've completed it.  And, you know, I

1  often say that in these Marksman proceedings we are here in the

2  first jury charge conference of the case.  The whole reason why

3  the Supreme Court and Federal Circuit tell us to do these

4  Marksman hearings is to translate these esoteric technical

5  concepts and use something that's accessible to the jury.

6         And I have to admit the Court's preliminary

7  construction is better than mine.  So I admit it right up

8  front.

9         And, you know, when we look at the -- when we look at

10 the intrinsic record in this case, Your Honor, we think this is

11 pretty compelling.

12        So we begin with the notion that the specification is

13 just absolutely overwhelmingly in favor of the preliminary

14 construction; that it shows us time and time and time again

15 that the fundamental concept of the '908 and '302 patents is

16 this idea of overlaying these multi-channel signals with a DSSS

17 or D triple S signal.  The patent tells us that this is, you

18 know, it tells us right at the outset of the specification that

19 that's, in fact, where this invention lives.  And they do it

20 not just in passing; it's not just an accident that they

21 embrace the overlap between multi-channels or MC signals and

22 the D triple S techniques.  And it's done for very good reason,

23 for reasons that the patent tells us are critical, critical to

24 the performance of the invention.

25        So on 581, what I've got is an excerpt.  It is indeed

1  from Column Two as counsel suggested I might because he knows

2  that these patents are directed to the notion that you're going

3  to use this DSSS technology because it's uniquely situated to

4  be used alongside the open channel approach.  And the idea is

5  that you can use this DSSS that has, you know, great properties

6  in this particular context, such as simplicity,

7  self-synchronization and performance under severe interference,

8  which is exactly what happens in an initial random access.  And

9  the patent tells us that right at Column two, lines 49 through

10  53.

11      And it's this notion that you're going to take advantage

12  of both different approaches to mitigate the weaknesses that

13  the patent is really focused on.

14          Critically here, Your Honor, this isn't a case where

15  the specification tells us that this is an option.  You might

16  be able to do it this way; you might be able to use D triple S.

17  What we have is a specification that stresses the importance of

18  DSSS, the criticality to the overall function of the system and

19  then tells us the embodiments -- those are the magic words.

20  The embodiments, plural, of this invention, use the combination

21  of MC and DSSS signals.

22          What the law tells is when the patentee chooses to use

23  that term, a clear statement of specification, that the

24  invention or the embodiments of this invention, or the present

25  invention, all those are magic words that patent lawyers then

1    say, okay, you're telling the whole world, you're telling the

2    public that your invention is directed to this concept, and

3    that has a couple of impacts.  Number one, it means you have

4    ownership of that concept and you have ownership of using DSSS

5    in a random access signal context.  But it also says that

6    that's what we own.  They are setting the boundaries of what

7    they actually own.  And in the *Microsoft* case that we cite,

8    makes it clear that when the patentee chooses to do that, we

9    didn't write this patent; we didn't tell them to do it.

10           When they choose to do it, they have to be held to

11   their word.  They have to be true to their word, and the patent

12   has to cover what they told the whole world it would cover.

13           The other magic words are all the embodiments.  We

14   just saw that as a specification, all embodiments plural of the

15   present invention are broad and unequivocal.

16           And, again, they choose those words.  They choose to

17   come into the patent office with that specification and they

18   have to be held to it.

19           The other thing that struck me, and I'm stepping

20   forward a little bit, Your Honor, to '588 is the ubiquitous

21   nature of their reliance on DSSS.

22           I counted, there were over 125 references to DSSS.

23   But importantly, there were no references to any other modality

24   for carrying out a random access signal.

25           You know, I have not convinced the Federal Circuit to

1   write a case that talks about the ubiquitous claim construction

2   canon just yet, but it should be there, because of ordinary

3   skill in the art leading this specification is confronted with

4   the fact that DSSS is used over and over and over again.  And

5   again, they have to be true to their word.

6           The *Wireless Protocol Innovations* case tells us that

7   repetition, in fact, does have an impact on claim construction.

8   That, you know, taken with the uniformity of the specification,

9   then maybe I do have my ubiquitous canon of claim construction

10  after all.  You can't go into the patent office, tell them that

11  your patent is directed toward providing a random access signal

12  using a DSSS signal, and then walk it back when it comes time

13  for litigation.  That's just not the way the system works.

14          We did have a bit of prosecution history on this term.

15  There was a little back and forth between the patentee and the

16  patent examiner.  And as Your Honor knows, this is often very

17  illustrative and we will see the true intentions of the

18  patentee and the true understanding of the patent examiner as

19  we look at their correspondence.  A little bit like a draft

20  history in a contract negotiation.  You know, those red lines

21  tell us a lot -- what arguments did they make; what did they

22  say about it?

23          It's -- I guess you would call it parole in a contract

24  dispute, but here it's intrinsic.  It's part of the actual

25  record.

1      And we know that they were debating.  The examiner

2  said, "You know, I don't know what you mean by this disclosure

3  of the initial random access signal by some time duration and

4  the guard period length."

5      He was unclear that -- whether the disclosure itself

6  actually told him what that was.  So the applicant responded.

7  And here they said, this feature, the random access signal

8  feature, this feature is illustrated at least in Figure Five

9  and then described in Paragraphs 34, 35 and 63.

10      Well, let me show you those, Your Honor.  This

11  feature, it turns out is in Figure Five.

12      And I apologize because I know this is somewhat hard

13  to read.  But you'll see that there is an OFDM signal.  This is

14  the multi-channel signal shown as Elements 512.  And then

15  there's a spread spectrum signal, Number K.  And they're

16  pointing to this spread spectrum signal, Number K, as being the

17  random access signal.

18      And then when we would go to the paragraphs that they

19  cited, we see, in fact, that these are DSSS signals.  So in the

20  middle of Paragraph 35, it says that are synchronized, for

21  example, DSSS signal Number K in Figure Five.

22      So, again, over and over and over again, the patentee

23  chose to point to these DSSS signals as the random access

24  signal.

25      NEO, I heard an argument suggesting that perhaps this

1   is just one embodiment, but that is just not true, Your Honor.

2   You can study it in every single embodiment of this invention,

3   this specification, the patentee pointed to DSSS signals and

4   nothing else.

5           You know, we had a little bit of discussion about

6   whether the specification involves -- it can somehow be

7   imported into the claims, and that's not what we're doing here.

8           What we're doing is we're holding the patentee to its

9   word.  What the Federal Circuit told us in *Phillips* is the

10  specification is often the single best tool that we are to use

11  to interpret the patent claims.

12          And that's exactly what we're doing.  There's no

13  importation here.  And if I can -- let me just jump ahead a

14  little bit and talk about claim differentiation.  Counsel

15  pointed you to Claim Eight and said, well, in Claim Eight, they

16  talked specifically about DSSS signals or at least DSS signals,

17  I guess, it wasn't direct.  But the fact of the matter is, Your

18  Honor, claim differentiation is one that we have to be really

19  careful about using.  The Federal Circuit has called it a weak

20  canon of claim construction, if a canon at all.  Because we, as

21  patent lawyers, are trained to vary our claim patterns, to add

22  details sometimes recursively and so you have to be really

23  careful about trying to use claim differentiation as a primary

24  basis to construe the claims.

25          If I can be heard for just a moment on counsel's

1  argument with respect to disclaimer, we see this in all these

2  cases, that the patentee will come in and say, no, no, no, you

3  can't look at the specifications, you can't look at the

4  prosecution history unless you get to the level of a

5  disclaimer, but that's a little bit of an overstatement -- it's

6  a lot of an overstatement.  What disclaimer law tells us is if

7  my claim says four-legged mammal and everybody understands what

8  a four-legged mammal is.  It's precise, it's -- everybody knows

9  what a four-legged mammal is.  And in your specification or

10  your prosecution history, you says it doesn't count for horses.

11  The horses will not be covered by this patent.  That's a

12  disclaimer and that can be used to limit the claims.

13       That's not what we're doing in this case.  In this

14  case we are using the specification and the unanimity, the

15  ubiquitousness of the reliance on DSS to properly frame RAS for

16  this jury.  That's entirely appropriate and the straw man of

17  suggesting that we have to reach a disclaimer is exactly it,

18  it's a straw man.  It's a bridge you don't need to reach

19  because it's just not appropriate here.

20       So with that we believe the Court's proposed

21  construction is exactly correct, and we think that the

22  construction should be a direct sequence spread, spectrum

23  signal -- excuse me.  Used as a random access signal.

24       And then, Your Honor, we had talked about maybe

25  covering the '302 claim as well here.  And if I can jump ahead

1    to Slide 132.  This is the probing signal element.  And the

2    arguments are pretty much the same.  I can take you back

3    through the slides and you'll see over and over again that the

4    probing signal is also equated with a DSSS signal.  If I can go

5    to, for example Slide 137.  It talks about using DSSS for

6    channel probing in Column Two, lines 44 through 50 again.

7    Again, they stress the signal properties of simplicity or

8    self-synchronization performance but what I would like to do,

9    if I could, Your Honor, is to race ahead a little bit to the

10   slides that are sort of unique for this element which -- I

11   can't quite type this morning

12            There we go.  And that's the prosecution history on

13   probing signal is a little bit different.  So in the

14   specification the inventor tells us that channel probing uses

15   DSSS.  They're quite candid.  It's very straightforward, and

16   they claim one of the advantages of using DSSS as a probing

17   signal and that's at Column Nine, lines 31 through 35 from

18   Slide 147.

19            But then in the prosecution's history itself at Slide

20   148, the applicant itself equated DSSS with probing signal, and

21   they did it in a signal phrase.  Specification describes

22   various schemes that may be used to minimize interference

23   between the DSSS, paren, probing, paren signal and the MC or

24   multi-carrier signals.

25            So they made their case very clear here, and this is

1    not a situation we're trying to interpret something that was a

2    thinly veiled reference or an accidental, you know, slip of the

3    draftsman.  They've done it consistently; they've done it

4    repetitively; they've done it in the specification; they've

5    done it in the prosecution history and in having told the world

6    that that's what their patent is all about, they need to be

7    held to it.

8            So, with that, we think the Court's preliminary

9    construction is correct, and I'll pass the podium unless Your

10   Honor has any questions.

11           THE COURT:  I thank you very much.  Is there any

12   response?

13           MR. BLOMQUIST:  A couple brief points, Your Honor.

14   We've heard, I think, a few times the phrase from opposing

15   counsel about telling the world what your invention is.  And,

16   of course, basic claim construction law discuss the claims.

17   The claims provide the notice, the claims provide the metes and

18   the bounds.  And that's why the analysis starts with the

19   claims.

20           Interestingly, the analogy about altering, you have a

21   well-understood term is apt here that opposing counsel gave.

22   We have a four-legged horse.  A random access signal is very

23   similar in that regard and, in fact,  the unrebutted testimony

24   here is similar and to exclude something from the scope of that

25   well-understood term, you do need that express disclaimer of,

1    but not horses.  Right?  That's exactly what we're talking
2    about here.

3           As far as turning to the specification, this
4    ubiquitousness argument has been squarely rejected.  That's
5    what *Thorner* has talked about in the cases like it.  You know,
6    talking about again, even if all the embodiments discussed in
7    the patent including specific limitation, it's not proper to
8    import it.  Again, you can use it throughout your description,
9    throughout your description of the specific mode that you're
10   talking about, and that does not mean whether it's ubiquitous
11   or otherwise that you limit the claim scope of a term that has
12   an ordinary meaning.

13          And the term -- again, the affirmative statements of
14   disclaimer of the patent talking about the embodiments, you
15   know, confidential -- on similar statements, and again those do
16   not rise to the level of disclaimer.

17          THE COURT:  Thank you.  Thank you very much.  I think
18   we can move on then to the next term and in this case, we are
19   talking about the seventh one here, and that's the time
20   frequency resource --

21          THE COURT REPORTER:  Judge, I apologize.  I'm having a
22   hard time understanding you on this one.  This is the court
23   reporter.

24          THE COURT:  I'll speak up nice and loud here.  So we
25   are talking about the sixth one here -- I'm sorry, the seventh

1    one and that's the time frequency resource unit.  So let's hear

2    some argument on that one.  That's from Patent '450, claims

3    seven and eleven.  So who would like to address that for

4    plaintiff?

5         MR. HAMAD:  Good afternoon, Your Honor.  This is Hamad

6    M. Hamad for NEO on the time frequency of the first unit.

7         THE COURT:  How much time would you like, sir?

8         MR. HAMAD:  I think about five minutes, Your Honor.

9         THE COURT:  Go ahead.

10        MR. HAMAD:  Thank you.  So on this term, Your Honor,

11   the first thing I just wanted to start off by pointing out is

12   that the heart of the defendants' proposal here is disclaimer.

13   Just for purposes of the record, I wanted to point out that as,

14   we relay on our briefing, we don't think that they have met the

15   disclaimer standard here, *Continental and Thorner*, we've heard

16   a lot about them today.  In particular, they explain that

17   contrasting and comparing the prior art in the context of an

18   embodiment of an invention is not enough for disclaimer,

19   criticizing the art is not.  And then even having only one

20   embodiment described throughout the specification would not be

21   enough for a disclaimer.

22        I'm going to actually jump to the Court's proposal

23   here.

24        I'm sorry.  Let me share on the screen.

25      (Slideshow displayed and shown throughout presentation.)

1          MR. HAMAD:  And this is, I guess, where I would like

2     to spend some time.  The Court's preliminary construction, from

3     our view, still does a little bit of the disclaimer and

4     importation of some of those statements from the IPR.  We do

5     think the Court's preliminary construction rejects most of the

6     most problematic issues from the defendants' proposal and, you

7     know, more closely aligns with how we think the law and the

8     statements from the IPR should fall out.

9          One thing I wanted to display here is when you put the

10    Court's preliminary construction into the claim language, you

11    end up getting this repetition or this redundancy of the

12    mention of the number of symbols and subcarriers.  So the plain

13    language itself already gives elaboration on what a time

14    frequently resource unit and it's this bolded, italicized

15    portion, where the claim says that each unit containing a set

16    of frequency subcarriers in a group of OFDM symbols, where

17    N equals 248.  And so with the Court's construction we would

18    have a mention of symbols and subcarriers of twice and we think

19    there's some potential confusion that could be introduced

20    there.

21          So, you know, while our primary position is still that

22    there should be no disclaimer for this term, and that it should

23    just accord its plain and ordinary meaning as even Volkswagen

24    in its IPR stated or took that position, if the Court was

25    inclined to nonetheless construe it using its preliminary

1    construction, we would propose a modification for clarity here.

2           If we take the Court's regularly shaped phrase and we

3    include it into the term -- or for the term, time frequently

4    resource units, leaving an undisturbed the each unit containing

5    a product frequently subcarriers in a group of OFDM symbols,

6    leaving that phrase undisturbed so we don't get a reputation of

7    symbols and subcarriers where there's potentially some

8    confusion.  And that's all I have on this term, Your Honor.

9    Unless you have any questions, thank you.

10           THE COURT:  Very good.  Thank you very much.  So who

11   would like to respond on behalf of the defendants?

12           MR. ERICKSON:  Your Honor, Brian Erickson with DLA

13   Piper representing the Toyota defendants.  I'll respond here.

14           THE COURT:  You can have five minutes, sir.

15           MR. ERICKSON:  Slide 101, Your Honor, the key dispute

16   is whether NEO's wireless disclaimer in the IPR was clear.  In

17   fact, it's the only legally relevant dispute before the Court

18   and it's dispositive of the construction of this term.

19           Going to Slide 102, what we have here on the left is

20   the penultimate paragraph used by NEO Wireless to clear this

21   patent of Dell's IPR.  I say it's the penultimate paragraph,

22   Your Honor, because there are approximately eight pages worth

23   of argument that NEO Wireless made building up to this

24   paragraph, all about the specification, comparing it to the

25   prior art, and talking about embodiments, but NEO wireless knew

1    that wasn't enough.  NEO Wireless knew that the board at the

2    patent office doesn't care whether you distinguish the prior

3    art in the embodiment.  That won't cut it.

4            They had to distinguish the prior art from the claims,

5    and to do that, they got to this paragraph.  This is the

6    conclusion.  This is the penultimate paragraph.  After this

7    paragraph, they begin using this disclaimer to distinguish

8    prior art.

9            So let me parse this paragraph briefly, Your Honor.

10   The first sentence you see starts "The inventions."  One

11   diminishable basic resource unit or quote, time frequency

12   resource unit, close quote, as recited in the independent

13   claims.

14           Let me stop there, Your Honor.  That is a remarkable

15   introductory phrase when it comes to patent law.  This is a

16   patent that is -- at the time was in co-pending litigation with

17   Dell.  This is an IPR, the lawyers and NEO Wireless knew

18   anything they said could and would be used against them and to

19   start this paragraph that way is the reddest of red flags.  And

20   that leads us right into the disclaimer itself.  So after

21   clarifying and talking about invention and the quoted claim

22   term as used in the independent claim, they state, quote:  "A

23   time frequency resource unit is not an arbitrary combination of

24   time and frequency units and is, instead, designed according to

25   the application requirements of the application that is being

1    grouped."

2          Now, NEO Wireless started there in the negative, and

3    let me start with that first phrase, Your Honor.  If you take

4    time frequency resource unit out of the intrinsic record, if

5    you take it out of the patent, ignore the specification, ignore

6    the file history, and you just look at the words "time

7    frequency resource unit," it is an arbitrary combination of

8    time and frequency units.  Right?  It can be three time units

9    and three frequency units, or maybe five of each.  It's

10   arbitrary.  Any combination of those could be used as a unit.

11         So what we have here is a clear and unmistakable

12   disclaimer of the ordinary meaning.  So NEO Wireless's proposed

13   construction has been disclaimed.  And that creates a massive

14   void, Your Honor.  When one of ordinary skill is reading this

15   and sees the patent owners say, "I don't want the ordinary

16   meaning.  This as used in the claim is not the ordinary

17   meaning," there's a massive void there and something must fill

18   that vacuum.  So once they've erased the ordinary meaning and

19   writing on a blank slate, they define precisely what they mean

20   in the claim for this term.  They say it is instead designed

21   according to the applicational requirements of the application

22   that is being grouped.

23         You see defendants' proposed construction on the right

24   here?  Faithfully and verbatim takes that language as the

25   proposed constructions.

1    So the IPR here, this statement, is clear, it's

2    unmistakable, and, in fact, Your Honor, it's really -- were

3    uniquely postures here where it comes to this type of claim

4    construction dispute, because NEO Wireless never addressed this

5    language.  We brought it up for briefing in our meet and

6    confers and we told NEO Wireless, we're using your language,

7    we're quoting your language.  Tell us why it's not clear.  Tell

8    us what the possible mistake would be.  And Neo Wireless choose

9    not to address it in its opening brief.  That was frustrating.

10   We thought they were sandbagging us in bringing it up in their

11   reply, but then they didn't address it in the reply.  This is

12   like having a clear contractual term and one party says the

13   clear contractual term supports us and the other party doesn't

14   address the contract.  They just address parole evidence or

15   something.  There is really no genuine dispute in material fact

16   that this statement is clear and unmistakable.  There's no

17   ambiguity here.  NEO Wireless and its expert don't come back

18   and say this is confusing.

19       Here's where something, a person of ordinary skill

20   might think I don't know what you mean here.  This is

21   ambiguous.  This isn't clear.  We can mistake it for something

22   else.  There's simply no clash on this issue, Your Honor.  This

23   is legally dispositive.  This is a clear and unmistakable

24   disclaim of claim scope.  It's not the ordinary meaning.  It's

25   the meaning they assigned it here.

1          What NEO does argue, NEO Wireless spent in most of its

2     brief, it spends time discussing what it alleges are other

3     disclosed embodiments.  Now it factually incorrect, Your Honor.

4     And I don't have time to go into why it's factually incorrect

5     but legally -- what's important is that legally it's

6     irrelevant.

7          It doesn't matter how many other embodiments you

8     might have disclosed.  Let's assume that one embodiment grouped

9     applications and designed the units according to the

10    application requirements of the application that is being

11    grouped.  Let's assume that's only one embodiment and let's

12    assume there are 12 other disclosed embodiments that do it

13    differently.  It doesn't matter, right?  This is a disclaimer.

14    They said not the ordinary meaning, maybe we could have claimed

15    more, maybe be could have made a different disclaimer, maybe we

16    could have said designed according to common parameters or

17    something broader.  Maybe they could have done that, but they

18    didn't.  This is the disclaimer they made and this is the

19    disclaimer they used to free this fact from the IPR.  The

20    public, including the defendants, are entitled to rely on it.

21          Briefly, Your Honor, the Court's preliminary

22    construction doesn't go far enough.  This is a disclaimer.  It

23    is all or nothing.  The Court's preliminary construction of a

24    regularly-shaped unit having a fixed number of symbols and

25    subcarriers, it does not accurately reflect this disclaimer.

1    In other words, you could have a regularly-shaped unit with a

2    fixed number of symbols and subcarriers, again, maybe three of

3    each, right?  That would be regular.  It would never change.

4    Every application and every communication would always have to

5    use it, no matter how inefficient it was.  So it would be

6    regular, it would be fixed, but it would still be arbitrary.

7    There's just a number that had been picked.  It's arbitrary

8    with respect to the application being briefed.  So it does not

9    accurately reflect this disclaimer.

10           Additionally, jumping forward a few slides.  The

11   Court's preliminary construction would exclude all disclosed

12   embodiments.

13           I'm sorry, Your Honor.

14           THE COURT:  I'm saying we're getting close to the end

15   of your argument.

16           MR. ERICKSON:  Yes, Your Honor.  In the only disclosed

17   embodiment it uses one size unit, it designs one type of unit

18   for voice applications and it uses a different unit for video

19   applications.  This is the only disclosed embodiment that is

20   discussed at length by patent owner in the IPR as well.  So

21   they're not regular and they're not fixed.  They're irregular

22   as you go along and they change as you go along, as you go into

23   different application groups.

24      Looking back to the actual disclaimer, Your Honor, there

25   is this -- in sentences three and four in this penultimate

1   paragraph.  It does talk about regularly shaped units, but it's

2   regular in the context that it's regular for the application.

3   If you look at each of these phrases, if you see my cursor, it

4   states regularly shaped time frequency resource units allocated

5   at the application granularity level.  So they change.  They're

6   irregular when you switch to a different application, but

7   they're regular for that application.  And then the same thing

8   with the final sentence, the regularity of the time frequency

9   resource unit only became unlocked due to the similar resource

10  requirements has been used of the same application.

11          So in sum, Your Honor, there's really no dispute

12  before the Court.  There's no argument by NEO Wireless that

13  this is somehow a confusing or might be mistaken for something

14  else.  This is a clear and unmistakable disclaimer, and that's

15  it.  The fact that the patent could have said something is

16  irrelevant.

17          That's all, Your Honor, unless you have any questions.

18          THE COURT:  Thank you, Mr. Erickson.

19          So would you like a brief response?

20          MR. HAMAD:  This is Hamad Hamad for NEO.  So the first

21  thing that I want to address is this notion that in our briefs

22  we didn't respond to defendants' arguments about the alleged

23  IPR disclaimer according to our opening brief Document 127 at

24  pages 23 to 24, where we directly address this.  In our reply

25  brief, document 133 at nine, where we cite Mr. Alberth's

1   declaration, Paragraph 41, where he also addresses this.  So

2   I'm not sure where that comes from.

3          I want to -- let me share my screen very briefly.

4      (Document displayed.)

5          MR. HAMAD:  This is Mr. Alberth's declaration on this

6   point that I wanted to make.  The point that I -- I'm sorry,

7   Your Honor.

8          Our argument in the brief was that IPR references did

9   not suggest one dimensional time frequency.  These are excerpts

10  that defendants rely on -- I'm sorry.  These are excerpts from

11  the pauper that the defendants rely on.  And Figure six in

12  particular that was used in this discussion is an embodiment

13  that relates to WiMax.  It uses WiMax in the invention.  And

14  that was the most relevant embodiment to respond to Dell's IPR

15  that asserted WiMax itself had an exemplary embodiment.  So

16  this walks into the *Continental* case, saying if you are

17  contracting and comparing prior art with respect to an

18  embodiment, that is not going to be a disclaimer for all

19  aspects or all scopes, or all embodiments of the invention.

20         The last point I wanted to mention, counsel said that

21  the Court's preliminary construction would exclude the

22  embodiment from the invention.  And I think the focus there was

23  on actually Figure Six, but the Court's preliminary

24  construction is not that a zone is regularly shaped, but rather

25  a unit, a resource unit is regularly shaped.  And I would point

1    the Court to Figure Nine, which was actually something that was

2    cited in defendants' identification of intrinsic evidence when

3    we were doing exchanges and Figure Nine describes application

4    zones and then says, "The zones that are not used by

5    applications," which is another reason to not limit it to just

6    application-based grouping.  You have these zones called

7    Special Resource Zone and Figure Nine explains special resource

8    zones may be irregularly shaped.  But then goes on to describe

9    that they have subdivisions of predefined, kind of equal in

10   size, equal in shape resource units.

11          So I don't think the Court's preliminary construction

12   would want to follow that.  We would just propose, as I

13   mentioned, this modification for clarification and not to have

14   a duplication or redundancy of those terms, symbols and

15   subcarriers.

16          Thank you, Your Honor.

17          THE COURT:  Thank you.

18          So that will complete our argument regarding the

19   seventh term.

20          So let's move on to the eighth term and that term is

21   from the '941 patent, and the Claims 8 and 13.  And that phrase

22   says, "The antenna transmission scheme comprising as

23   transmission diversity scheme or a multiple input, multi-output

24   (MIMO) scheme."

25          That's the phrase that we're talking about there.

1          And who would like to address this?

2          MR. STEWART:  Your Honor, that will be me, Chris

3    Stewart, on behalf of NEO Wireless.

4          THE COURT:  How many minutes would you like?

5          MR. STEWART:  Five.

6          THE COURT:  Go ahead.

7          MR. STEWART:  So for this term and there's a similar

8    dispute with the next term, which is related to corresponding

9    subchannel configuration.  I think the dispute here really

10   arose from the long -- the history of having a prior litigation

11   where there was negotiation with Dell in a previous case that

12   led to an agreed construction.  That's obviously sort of an

13   unwieldy process and the difficulties inherent in language and

14   trying to be precise in these sort of things, led to what is

15   the dispute before you today, whether the words "alternatively

16   indicate" that we included in the agreed Dell construction

17   means something different than what we intended them to mean.

18          I think at the bottom, your preliminary construction

19   does a better job than we did in the agreed construction with

20   Dell.  The point here is simply that the intended transmission

21   scheme can indicate it's capable of comprising either a MIMO

22   scheme or a transmission diversity scheme, but not at the same

23   time.

24          The progression of the Dell negotiations, which is

25   evident in the defendants' exhibits, which are email exchanges

1    with Dell, show that our concern was, okay, we agree it has to

2    support both schemes, MIMO and transmit diversity, but we just

3    don't -- we want to be clear that it can't do both at the same

4    time.  We don't want to accidentally agree to a construction

5    that makes it nonsensical, that it has to at least

6    alternatively indicate one or the other.  Meaning they are not

7    being indicated at the same time.

8         Your preliminary construction I think captured that

9    for both of these terms without adding any unnecessary

10   additions and it avoids any disputes over whether there is some

11   sort of exclusivity and alternatively indicate that goes beyond

12   the scope of the claims and the intentions of our previous

13   construction.

14        THE COURT:  All right.  Thank you very much, and who

15   would like to address this regarding the defendants?

16        MR. HILL:  Your Honor, this is Reggie Hill and I'm

17   going to address this on behalf of the defendants and I think

18   I'll try and treat the two terms together as Mr. Stewart did as

19   well.

20        THE COURT:  Very good.  We'll be dealing with eight

21   and nine then.  And so you can have five minutes as well.

22   Mr. Hill, go ahead.

23        MR. HILL:  Thank you very much.  So we're start with

24   Slide 110.  Just to set the context, Your Honor, which I

25   actually believe you have in hand, but it would be helpful for

1    some of the discussion going forward here.  The title of this

2    is "Method and apparatus for Multi-carrier communication system

3    with adaptive transmission and feedback."  So you've got some

4    communication system that has to adapt and we've be talking

5    about this going forward.

6            But it's helpful to keep it in the context that it has

7    to make some choices in order to be adaptive and I think these

8    claim terms get at that choice.  Because if you go to the next

9    Slide 111, it's just a term there.  I think we can skip to the

10   next slide, which is 112.  And I've just shown here a bit of

11   context of the language that's in Claim Eight.

12           Your Honor probably realizes this, but Claim Eight is

13   a method claim.  Claim 13 is an apparatus claim, but the

14   language that is at issue is basically the same for the two of

15   them.  But in either case, as indicated here in Claim Eight,

16   you see the portion in green talks about this as being a

17   control message.  And the way that this adaptive feedback is

18   happening according to the '941 is via a control message that's

19   going from the base station or being received by the mobile

20   station or the mobile phone.

21           So there's a message and then that message has in it

22   some transmission parameters.  It's those transmission

23   parameters that are further described in the highlighted in

24   yellow language in this Slide 112 that get at the two claim

25   terms.  So these are really things that have to be in a message

1    going forward.

2            If you go to Slide 113, please.

3            And so Mr. Stewart is right.  The defendants started

4    this with the proposed construction that existed in the file

5    history, which included the Dell litigation, and you can see

6    that what looks like gray to me, the gray language as opposed

7    to the yellow highlighted language.  The gray language is

8    basically the same between the constructions.  You have the

9    yellow highlighted language that gives some differences.  The

10   main difference is being this alternatively indicated language,

11   which it looks like the Court is included in Claim Nine, but

12   not in Claim Eight in terms of the preliminary construction

13   that we had.

14           But if you move to the next slide of ours.  This

15   slide, Number 114, just really shows exactly the proposed

16   construction from the Dell litigation and it's exactly the

17   same, at least for this claim term eight as what was proposed

18   by -- agreed to by NEO in the Dell litigation.

19           I think you can move to the next Slide.

20           And 115 is consistent with NEO's position.  NEO's

21   position has been that they agree with the Dell Construction.

22   And I think it's Mr. Stewart who intimates there's some

23   commonality between the constructions that are being given

24   here.

25           So with that, would you move to the next slide?

1     I won't dwell on it, but for the Court's benefit,

2 there's an indication of where, at least for the first term,

3 the support is in the '941 specification and you can see

4 clearly it's a choice between transmission diversity, which is

5 about improving transmission robustus.

6     And so you're sending in most cases, multiple

7 information to be received so that you guarantee its receipt

8 versus the, what we call the MIMO, M-I-M-O, schemes which are

9 used to improve transmission throughout, which means you're

10 sending information at the same time in multiple -- over

11 multiple channels so that you can improve how much information

12 is being sent in a particular time.

13     If you can move forward, Mr. Murray, that would be

14 good.

15     The alternative indicate language comes directly out

16 of the claim, where they say you indicate or, you know, which

17 the or Is between the transmission diversity schemes or the

18 multi-input-outputs, and then I would also indicate that the

19 lower language which relates really to Claim Nine, there is

20 about the corresponding channel configuration and the claim

21 language says, "Characterized by distributed subcarriers for

22 localized subcarriers in the frequency delays," really

23 represents the second choice and that's where the support is

24 for the alternative indicate language.

25     You can move forward to the next slide, please.  I

1  think we can skip Slide 118 and 119 which really dealt with, I

2  think a dispute that's not actually a dispute between the

3  parties.

4          If we would go to the second term, which is Claim

5  Nine, which deals with these -- the corresponding subchannel

6  configuration, again, I want to reflect that this is a message

7  and in that message there has to be an indication of which of

8  the subchannel configuration are actually used.  One that has

9  distributed carriers or localized subcarriers.

10          As a part of the construction from the Dell

11  litigation, there was some language in there to say to avoid

12  any doubt, this requires supporting both of the alternatives,

13  whether you're talking about for Term Eight or Term Nine.  And

14  I see that language made it into Term Eight.  It did not make

15  it into Term Nine, which the Court made more consistent, I

16  believe, with the PTAB.  So there's some question in my mind as

17  to whether there might need to be some level setting or trying

18  to make them correspond more appropriately for a judge or jury.

19          But it's important that the alternative indicate

20  language be in both, and that in order for the message to be

21  able to be chosen between two alternatives, obviously, the

22  system must support both alternatives.

23          If you move forward to 121.

24          This just shows the difference between the

25  alternatives.  At least it's in the initial meet and confer

1    process, NEO was not including the alternative indicates

2    language in this term, which is number nine in the Court's

3    listing of preliminary constructions, but the language is there

4    in the Court's construction, and we believe that that is

5    appropriate.  We believe that the language could also be in

6    Claim Term Eight to indicate that their alternatives, both for

7    consistency and because I believe the claim language also

8    supports that.

9            If you can move forward.

10           THE COURT:  Let me ask you, counsel, why so focused on

11   the word "alternative?"   So in the Court's proposed

12   construction for eight, it's clearly an either/or.  When you

13   say  "alternatively indicate" you mean something is different

14   than either/or?  I mean --

15           MR. HILL:  No.  I don't think it means anything

16   different, Your Honor.  I think it was put there to make sure

17   that it was a choice between those two things, and I believe

18   the language -- I'm not sure in regular parlance which one

19   would be more palatable to a jury, but I don't believe -- I

20   think it's the alternative choice between those two parameters.

21   It's just stated differently in the two constructions.  I don't

22   know if people will think that means that has to mean something

23   different or not.

24           THE COURT:  Your main point is that you want to use

25   language such as indicates alternatively or alternatively

1    indicates or in some way or another, that they are alternatives

2    to each other so that it's clear that it's an either/or

3    situation?

4           MR. HILL:  That's accurate, Your Honor.  And in

5    addition to that, it should be made clear that there must be

6    support in the system for both of those alternatives.  In other

7    words, it wouldn't be enough that you only supported one and it

8    indicated that one.  So you have to ask the Court for both of

9    those.

10          THE COURT:  All right.  Thank you very much.

11          MR. HILL:  If you can forward again.

12          THE COURT:  You're just about out of time, so why

13   don't you wrap it up.

14          MR. HILL:  All right.  I think that really covers the

15   issues, Your Honor, unless you have some other questions with

16   respect to both eight and nine.

17          THE COURT:  No.  I think you've done a good job

18   clarifying that for me.  So thank you very much.

19          Is there any rebuttal?

20          MR. STEWART:  Yes, Your Honor, if I can respond

21   briefly.  This is Chris Stewart.

22          May it please the Court, sorry.

23          THE COURT:  Go ahead.

24          MR. STEWART:  Okay.  I talked over you for a minute

25   and didn't mean to.  I think we understand each other.  The way

1    Mr. Hill just characterized the dispute, I don't think there is

2    one.  We agree that they have to be alternatives.  It's one or

3    the other and that you have to support both.  The dispute in

4    the briefing, which it sounds like it's no longer a dispute,

5    was whether them acting as alternatives to each other also

6    meant that the system as a whole could also not support any

7    other schemes in other contexts.  We thought they were trying

8    to import this additional thing and it sounds like that's no

9    longer in dispute, in which case we have no issue on that

10   point.

11          The one other thing I'd raise is there was a dispute

12   just for Term Nine, the subchannel configuration.  That was

13   addressed in the briefing about whether the indicate language

14   in the claim term requires an actual, distinct indication.  You

15   recall that?  I didn't hear that addressed by defendant

16   counsel, so that's no longer in dispute and we're just dealing

17   with the Court's construction as it is, then there's nothing to

18   address.

19          I just wanted to make clear that to the extent that

20   it's still in dispute, we obviously think that the subchannel

21   configuration is characterized by certain subcarriers, not

22   necessarily accompanied by a second indicator.

23          THE COURT:  All right.  So thank you, Mr. Stewart.

24          I did want to turn to Mr. Hill briefly.  So

25   Mr. Stewart is indicating that after listening to you and

1    indicating that he sees your position as one which states that

2    as long as it's clear in the language that we use here, that

3    it's an either/or situation and that whichever of these two

4    systems is used is adequately supported, that he doesn't

5    disagree with you.  Do you agree that you don't disagree with

6    him either?

7               MR. HILL:  (Zoom audio muted.)

8               Okay.  I was on mute, I'm off now, I'm sorry.

9               The characterized language that is not in the Court's

10   construction and what's there is that it indicates as

11   alternatives distributed subcarriers and localized subcarriers.

12   So we believe that that is accurate.  I believe that that

13   addresses what Mr. Stewart was referring to.

14              But the characterized language is not there.  So

15   there's certainly no dispute with what the Court has with

16   regard to the alternative indicate language in the

17   construction, the preliminary construction.

18              THE COURT:  By that you mean that you like the Court's

19   proposed language and still oppose the plaintiffs' proposed

20   language, but the general description that Mr. Stewart just

21   gave, you don't dispute that; is that right?

22              MR. HILL:  It's a little bit unclear to me what

23   Mr. Stewart is saying, but I know that I agree that

24   alternatively indicates language needs to be indicated

25   in -- for this choice needs to be indicated in the message as

1    specified in the Court's preliminary construction.

2            THE COURT:  All right.  So if I'm following you

3    correctly, what's your position regarding what we just heard

4    from Mr. Stewart, you agree that there's not a dispute anymore,

5    setting aside the precise words to be used, do you agree that

6    you look at it the same way?

7            MR. HILL:  I don't think there's a dispute that I'm

8    aware of, given where we are right now, Your Honor.  I think

9    the language "characterized by", is not in the construction,

10   and, therefore, the construction that the Court has given and

11   the one that was proposed by the defendants that had the

12   indicating alternatives resolved any dispute.

13           THE COURT:  All right.  Thank you very much.

14           MR. STEWART:  May I respond briefly to that?  I

15   apologize.

16           THE COURT:  Sorry?

17           MR. STEWART:  May I respond briefly to that just to

18   make it clear?

19           THE COURT:  Go ahead.

20           MR. STEWART:  This is Chris Stewart again for NEO.  I

21   just want to be clear that we don't view the removal of the

22   word "characterize" as actually the Court adopting in its

23   preliminary construction the idea that there has to be a

24   separate indicator flag.  So if that is still in dispute, I

25   just want to make clear on the record that we still do not

1  agree that the scope of this term requires an indictor flag

2  distinct from just the designation of the subchannel

3  configuration itself.  If that's still in dispute, maybe it

4  ends up just being a factual issue that the experts battle

5  about it at trial, and you don't have to resolve it.  But if

6  Mr. Hill is saying that is still a dispute and they're

7  interpreting your construction as requiring that, requiring

8  that indicator flag, I just wanted to make clear that we would

9  still dispute that and maybe we'd propose some additional

10  clarifying language in the Court's construction to the effect

11  that it is not so limited in that way.

12         THE COURT:  Okay.  The Court is somewhat encouraged to

13  say whatever at this point.  I hear what you're saying on both

14  sides.  We'll take a look at it.

15         MR. HILL:  Sorry for belaboring it.

16         THE COURT:  You guys are not very far apart, but okay.

17         So let's -- I think we finished ten already because

18  that was the probing signal.  But 11 has some additional

19  language that's also in front of the '302 patent and that

20  language is as follows:  It says, quote, a probing signal is

21  configured to occupy a portion of spectrum in the uplink

22  frequency banner, not designated for transmission of uplinked

23  control signals in the system, end quote.  So the plaintiff can

24  be heard on this.  And so go ahead, sir.

25         MR. BLOMQUIST:  Yeah, Your Honor.  Good afternoon now.

1    This is John Blomquist for Neo Wireless.  And I'm grouping

2    these terms together and I just want to make sure that I am

3    grouping them correctly.  The defendants have grouped them

4    together as, quote, antecedent basis terms, and the -- I'll be

5    brief on it.  It's essentially they just want to import and add

6    words from the preamble throughout the specification -- it's

7    not the specification.  The claim, excuse me, based on the

8    agreed construction and the fact that the preamble is limiting

9    and the sole basis for this is proposed is that it is to aid

10   the jury and results in curing jury confusion.  We see it as

11   the exact opposite.  It simply is going to make it hard for

12   people on the jury, especially when it be the judge's role and

13   not the role of the parties or experts to instruct on how to

14   effect antecedent basis in the claims, for example.

15            THE COURT:  I'll give you five minutes.

16            MR. BLOMQUIST:  Your Honor, that's really all I had to

17   say about it.

18            THE COURT:  Okay.  Very good.

19            And who would like to respond regarding this language

20   that we have in 11?

21            MR. TAPPARO:  Good afternoon, Your Honor, it's Robert

22   Tapparo for FCA.

23            THE COURT:  Go ahead.

24            MR. TAPPARO:  Like opposing counsel, I want to keep my

25   argument short.  Our construction is clarifying for the jury

1    something that both parties actually agree on.  During

2    briefing, both parties have agreed that the preamble is

3    limiting and NEO doesn't dispute the recitations as you -- let

4    me share my screen really quick.  This will illustrate my

5    point.  Recitations of broad system in red in the claim really

6    refer lack to the orthogonal treatment of the individual

7    multiplexing or OFDM system.  All defendants' proposed

8    construction is trying to do is clarify that each recitation of

9    "the system," is just referring back to the preamble, which

10   regardless of whether or not the preamble is limiting in this

11   case, which it is, both parties agree to that.  This is an

12   antecedent basis rule to where "the system" refers back to the

13   Orthogonal Frequency Division Mutliplexing System.  That's the

14   extent of our argument and we just believe that this would

15   clarify the point for the jury because they might not

16   necessarily understand the antecedent basis rule or "the

17   system" refers back to the OFDM system.  Thank you, Your Honor.

18          THE COURT:  Thank you very much.  I appreciate hearing

19   from both sides on that one.

20          So let's move on to our Number 12 and that's also from

21   the '302 patent.  It's Claim 23.  And that phrase is as

22   follows:  Quote, A receiver configured to receive a request

23   from a probing signal from a base station in the system.

24          So that's a disputed term and I guess I'll hear from

25   either Mr. Stewart or Mr. Blomquist.

1            MR. BLOMQUIST:  Yes.  This is **Bill Blomquist again

2    for NEO Wireless.  So just to be clear on the record, Terms 11,

3    twelve and 13 and both my brother's side can tell me, you know

4    if he disagrees.  I believe we're putting those together again,

5    Claim Term 11, 12 and 13 all are being changed or proposed to

6    be changed by defendants for the same reasons.  And I guess

7    given the opportunity again, just maybe in reply to state that

8    the basis somehow, the antecedent basis rule, that rule is a

9    rule of validity.  There's no dispute here that "the system" as

10    in the claims is somehow invalid or not specific as to what

11    system it's referring to as far as, you know, "the system."

12            I see the basis of that is clear.  And so to require

13    this -- there's no requirement in the antecedent basis rule to

14    add this language.  That assertion is not a basis to adjust

15    these claims as proposed.

16            THE COURT:  Got you.  And you're correct, these are

17    all together in one.  And so let's just have whatever response

18    is made as to this issue addressing both 11, 12 and 13.

19            MR. TAPPAN:  Your Honor, I have nothing further to

20    say.  I think my last argument captured our point.  Thank you.

21            THE COURT:  Thank you, sir.  Very good.

22            So we're gaining on it here and so we're at Number 14

23    at this point and that phrase is from the '512 patent and it's

24    Claims 15 and 23 and says, quote:  "Whether the first and

25    second pilot subcarriers must be received in at least one of

1    the time slots."

2            So who would like to address this?

3            MR. HAMAD:  Good afternoon, Your Honor.  This is

4    Hamad Hamad again for NEO.

5            THE COURT:  Good afternoon.

6            MR. HAMAD:  I think I'll need about five minutes for

7    this, Your Honor, or less.

8            I think that the essential dispute here is what does

9    the plain language of the claim mean?  Your Honor, our view of

10   this is that the claim term should have its plain meaning, but

11   just from kind of the meet and confer process, and as, you

12   know, just from prior litigation, we suspected that there might

13   be some difference of opinion about what that claim language

14   meaning is.  So we proposed this clarifying construction that

15   adds the word "same" before time slot in view of a person of

16   ordinary skill in the arts' understanding of the plain meaning

17   of the claim language.

18           And so NEO'S expert testimony is the only record

19   evidence of what a person's understanding of the term would be.

20   Mr. Alberth explains that pilots and other signals are

21   necessarily going to be transmitted in some time slot.  So when

22   you see the claim language, the first of the plurality of

23   subcarriers and the second plurality of subcarriers would be

24   understood to mean that there is at least one time slot where

25   both of those carries are transmitted and then subsequently

1   received at least one time.

2          He explains this in conjunction with Figure Five, and

3   then in reply or in response from the defendants, there was

4   this argument that Figure Two would be excluded or would

5   contradict the proposal.  I would just like as a background,

6   Figure Two is just showing the basic structure of a

7   multi-carrier signal.  There is only one set of pilot

8   subcarriers here.  So it doesn't show something inconsistent

9   with it, and it wouldn't be excluded by the proposal because

10  NEO's proposal doesn't require that both pluralities of the

11  subcarriers are received in every time slot together, just in

12  at least one of the same time slots.  So you could have

13  instances of a time, such as in Figure Two, where only one

14  pilot subcarriers are transmitted and subsequently received.

15         Defendants also had an argument that Claim 19

16  contradicts NEO's proposal as a claim differentiation type of

17  argument.  And, again, in unrebutted expert testimony, the only

18  record evidence of a POSITA's understanding of these terms, he

19  explains that a time slot could have smaller divisions such as

20  time symbols.  So independent Claim 15, the same time slot

21  would be a higher level and you could have two carriers within

22  the same time slot, but not at the same time symbol.

23         Claim 19 would then provide -- you could, for example,

24  have them at the same time symbol.

25         I think that's all I have on this, Your Honor.  Thank

1    you.

2          THE COURT:  Who would like to respond on behalf of the

3    defendants?

4          Thank you, Mr. LeRoy.

5          MR. LEROY:  Good afternoon, Your Honor.  This is John

6    LeRoy, if I may briefly respond.

7          THE COURT:  Mr. LeRoy, go ahead.

8          MR. LEROY:  So before we get into the slides, I'd like

9    to talk about the *Phillips* decision in the Federal Circuits

10   *Onbonk* construction, that when we're going to construe a claim,

11   we don't start with an expert's opinion.  We start with the

12   claims and then we look at the specification.  And, of course,

13   the Court can also take into account expert testimony, but it

14   cannot be at odds with the specification.

15         And I start there because the first and threshold

16   evidence presented by NEO is its expert extrinsic opinion and I

17   think that's just an important starting point.  And I would

18   like to go through the order of the procedure that the Federal

19   Circuit instructed that we do, which begins with a claim.  And

20   if I may share my screen, hopefully this works.

21         THE COURT:  So your position is that it should be the

22   plain and ordinary meaning, correct?

23         MR. LEROY:  Correct.  This is in response to NEO's

24   proposed construction.

25         THE COURT:  Yes.

1          MR. LEROY:  And so looking at the claim -- by the way,

2    Your Honor, the defendants agree with the Court's preliminary

3    construction, just to make that clear on the record.

4          This slide here that I have before Your Honor shows

5    that what NEO is doing here is not construction, they're not

6    taking a word in the asserted independent claim and

7    interpreting it.  They're adding a word.  So on the left we

8    have the actual claim language as printed in the patent and on

9    the right we have their proposed construction and, of course,

10   the only new word is "same."

11         As Your Honor well knows, when we add words to a

12   claim, we're narrowing them because the Federal Circuit has

13   instructed that all claim terms have meaning.  So when you add

14   new terms, you inherently narrow the scope of the claim.  So

15   when we look at the claim language itself as *Phillips*

16   instructs, we see right at the threshold, we're adding a new

17   word, not necessarily interpreting an existing word.

18         In this case, to the extent there's, you know, any

19   confusions over whether the word "same" belongs in the

20   independent claims or not, the other claims answer that

21   question, resolve that potential confusion.

22         *Phillips* instructs us, again, this is *Onbonk*, this is

23   the law of the land if we're going to construe patent claims.

24   Phillips states that if a term appears in a dependent claim and

25   in our case, it's dependent Claim 19, we have a presumption

1    that that term is not present in the independent claim, which

2    in our case, are Claims 15 and 23.

3            So we have a presumption that NEO neither acknowledges

4    nor responds to.  We do.  But I think it's important at the

5    threshold that just looking at the other claims of the patent

6    as *Phillips* instructs, undermines NEO's proposed construction,

7    but beyond the fact that we are entitled to this presumption,

8    which resolves this issue on its own, the actual specification

9    supports the -- supports the presumption.  This is not a case

10   where the patent exclusively describes one approach in this

11   case.

12           The patent does not exclusively state that in all

13   cases both cell-specific and common subcarriers must be

14   transmitted at the same time.  NEO cites no controlling

15   evidence of that.

16           And Figure Two, as we have advanced in our briefing,

17   shows why.  It's because the inventors when they wrote this

18   patent, contemplated something broader.  So Figure Two, to be

19   specific, is an example of at the same time transmission.  So

20   Your Honor, all those vertical arrows are at the same time.

21   And each referenced a P -- and I noticed that my yellow

22   highlighted somehow got mixed up along the way.

23           But each reference to P there, being a P arrow, if you

24   will, being transmitted at the same time.  This example is not

25   limited to one type of P or another type of P.  Okay.  This is

1    broad.  This example in Figure Two is broad just like Claim

2    One.  And it does not require -- it requires pilot signals, but

3    not both types being communicated at the same time.

4            And if we turn to Figure Five, this is the example

5    that NEO points to.  Figure Five is an example that -- and this

6    example does show both common pilot signals.  Those are the

7    arrows on the right with the little C on top and cell-specific

8    subcarriers, those have the little S.  This Figure Five does

9    show them being transmitted at the same time, but that's not a

10   requirement of the system.  The description of this Figure Five

11   never states it's a requirement of the system.  And when we

12   look at what the description of Figure Five is talking about,

13   it's something completely different.  It's talking about

14   aligning frequency.  So granted, this is a snapshot at the same

15   time of one example, but the whole purpose of this figure is

16   just to show that in all cases the common signals align in

17   frequency, they're directly above each other.  And in some

18   instances, the cell-specifics don't align.  They're not

19   necessarily above each other.  But that's a frequency issue,

20   not a timing issue.

21           So in addition to the fact that the patent nowhere

22   requires both to be transmitted at the same time, it's a

23   possibility for sure.  This figure is directed to an entirely

24   different concept.

25           Recently, as Your Honor is well aware, the parties

1    have submitted petitions for interparties review at the United

2    State Patent and Trademark office, and this patent, the '512

3    patent, is one of the patents in which the patent office

4    elected to undertake review.  And in doing so, on May 12th of

5    this year, the patent office rejected NEO's proposed

6    construction stating, as defendants do, and as Your Honor has

7    already determined, that the plain language of the independent

8    claims is broader.

9          We don't need to add a new word that expressly narrows

10   the claim beyond how they were originally printed.

11         THE COURT:  All right.

12         MR. LEROY:  I think that's it.

13         THE COURT:  So you're at the end of your time here.

14   Did you want to -- I know we have to discuss what you just said

15   on the slide here as our last term, but we'll ferret that out.

16   I'll say what it is.  That's the 15th term we been dealing with

17   here.  It's also from the same '512 patent found in the same

18   claims and the phrase is, "Second pilots of a second type."

19   And that is a praise that plaintiff asking the Court to

20   construe.

21         So who would like to address this for the plaintiff?

22         MR. HAMAD:  Thank you, Your Honor.  This is Hamad

23   Hamad again for NEO.

24         THE COURT:  Go ahead.

25         MR. HAMAD:  Thank you.  May I briefly respond to one

1    point on the last term, Your Honor?

2           THE COURT:  You may.

3           MR. HAMAD:  Thank you.  There was a statement that we

4    didn't address claim differentiation.  Again, our reply, 133 at

5    13, 14, Mr. Alberth's declaration, paragraph 49, we had it up

6    on the screen.  So I don't understand why that -- I guess

7    understanding of our position was taken, but that's something

8    that we did address.

9           On *Phillips* we did actually start with the claim

10   language, just like *Phillips* said.  Plain language though is

11   not just as to anyone off the street.  It's to a person of

12   ordinary skill in the art.  Record evidence is only from NEO on

13   what that term means and the rest of the defendants' arguments

14   are just attorney argument.

15          So thank you, Your Honor.  I'm ready to proceed to the

16   second parlance, if I may.

17          THE COURT:  Go ahead, sir.

18          MR. HAMAD:  Thank you, Your Honor.  The second

19   parlance of the second type, the defendant's proposal is

20   essentially a combination of disclaimer and lexicography.  And

21   the dispute is whether they have established just the first

22   threshold step of this claim to get there.  We note that the

23   Court's preliminary construction adopts a less restrictive

24   characterization of common pilots from the specification.

25   Respectfully, we don't think this disclaimer applies in the

1    first place, especially that second pilot should be limited to

2    common pilot.

3         Sorry.  Let me share this with you again.

4    (Document displayed)

5         MR. HAMAD:  So this is what I was describing.  The

6    chain language itself doesn't recite the phrase, "common

7    pilots."  It says "second pilots of a second type."  So to get

8    from the claim language of second pilots to common pilots,

9    defendants' proposal requires that you have disclaimer, such

10   that second pilot to the second pilot are only limited to

11   common pilot.  Once there, at Step one, their Step Two is then

12   they would need a type of definition or lexicography to insert

13   a particular description or characterization from the

14   specification.  And they just don't meet the threshold question

15   on disclaimer.

16        We've talked about some of these cases, but once again

17   *Continental* also goes back to *Libel Florsheim*, even when the

18   specification describes only a single embodiment and that

19   without more is not a disavow of claim scope.  And this is the

20   heart of their argument, is that this specification only

21   describes common pilot and it should be limited to that because

22   of the specification, but that applies in the face of the

23   Federal Circuit saying otherwise.

24        We also have --

25        THE COURT:  Why are you talking about this?

1          MR. HAMAD:  I'm sorry?

2          THE COURT:  The second pilots of a second type meaning

3    what?  What are they?  If they're not common, what are they?

4          MR. HAMAD:  They can be common.  We have expert

5    testimony on this explaining that a person of ordinary skill in

6    the art would understand that other noncell specific pilots

7    could be used alongside cell-specific pilots and it gives two

8    examples, the antenna specific pilots and mobile station

9    specific pilots.  And the specification, I don't have it on

10   this, but this specification also described the extension of

11   this system into an area with multiple antennas.  And so,

12   again, that would be consistent with Mr. Alberth's declaration

13   that a person with ordinary skill in the art would understand

14   that there's other noncell specific, noncommon pilots that

15   could be used with their invention.

16          That's all I have on this term, Your Honor.  Thank

17   you.

18          THE COURT:  Very good.

19          And who would like to address this for the defendants?

20          MR. LEROY:  Your Honor, if I may, John LeRoy for the

21   defendants on this term.

22          THE COURT:  Go ahead.

23          MR. LeROY:  So just like *Phillips* instructs, Your

24   Honor, the defendants start with the claim language itself.  As

25   the Court is well aware, the claim defines the first type of

1   cell-specific, but then we have the second type, and based on

2   the language of the claim, we know at least one thing, whatever

3   that second type is, it can't be cell-specific.

4           THE COURT:  Okay.  Thank you.  Just to tell you,

5   you've got six minutes.  So go ahead.

6           MR. LeROY:  Thank you, Your Honor.  If it's not

7   cell-specific, then it's inherently cell-common.  Consistent

8   with Your Honor's preliminary construction, the second type is

9   common to a group of cells or at least two or more cells.

10          THE COURT:  What do you have to say about what

11  Mr. Hamad was just saying regarding antenna specific or

12  global -- I think we said base station or specific or stuff

13  like that.

14          MR. LeROY:  Right.  Thank you, Your Honor.  Once again

15  he's citing expert testimony, extrinsic evidence about examples

16  that are not stated in the specification.  If the specification

17  had actually recited the examples alternatives, if you will,

18  that their expert cited, this would be a very different

19  conversation.

20          But in contrast to actually reciting other examples,

21  this specification doesn't.  As I think is undisputed, this

22  specification discloses only two types of pilot signals, the

23  common -- I'm sorry.  The cell specific recited in their

24  previous limitation and then these common pilots.  But beyond

25  just describing them or mentioning them, the patent

1   consistently -- and we have four examples on the screen before

2   Your Honor -- describes common pilot subcarriers or common

3   pilot signals as an aspect of the invention.  These are not

4   possibilities, options.  This is the invention.

5           This is not beyond ubiquitous.  It's in the title, the

6   abstract.  And I think almost every example or other -- I'm

7   sorry.  Every recitation of common pilot is not an example but

8   it is the invention.

9           And the cases that we've heard talked about today, the

10  *Continental* case and also NEO's counsel referenced the *Libel*

11  *Florsheim* case, those are two federal circuit cases that each

12  do concern reference to the invention, but they are not this.

13          In the *Continental* case, which has been identified

14  several times today, there open-ended terms were used.  You

15  know, one technique is an example.  The invention may be

16  implemented, using the word term may or can be implemented, can

17  be.

18          We don't have may and can be in the '512

19  specification.  We have definitive, declarative, the invention.

20  So in a nutshell, Your Honor, the intrinsic record, the

21  intrinsic evidence here is clear and unwaivering and would

22  trump any extrinsic evidence identifying examples that this

23  patent never contemplated.

24          We cite the same issue, which is how does the federal

25  circuit treat the usage of the invention in the context of

1    claim construction.  We have five examples here that we think

2    align with the facts of our case unlike the facts of the two

3    cases that NEO has cited and presented in the slides.

4            And if Your Honor doesn't have any questions, I think

5    that is all I have.

6            THE COURT:  Thank you, Mr. LeRoy.  I appreciate that.

7            And is there any rebuttal from Mr. Hamad?

8            MR. HAMAD:  Yes, Your Honor.  Two brief points.  The

9    first point is the term "pilots" is a term of understood in the

10   art.  It's understood to a person of ordinary skill in the art.

11   So they would also understand that there are different types of

12   pilots.  The only record evidence comes from Mr. Alberth's

13   declaration.  They chose not to rebut it.

14           *Phillips* itself says when you are looking at a term,

15   you are looking at it in the context and understanding of a

16   person of ordinary skill in the art.

17           I want to comment on the specification excerpt

18   because --

19           THE COURT:  Can I just?  So how is anybody supposed to

20   know what is meant by pilots of a second type?  In the first

21   type it's so specific.  So you just want pilots of a second

22   type to be completely open-ended with no understanding

23   whatsoever as to what it is not even that it's for common

24   pilots.

25           MR. HAMAD:  I don't think I would agree with that

1    respectfully, Your Honor.  One, it could contemplate and put in

2    common pilots for sure.  But then also a person of ordinary

3    skill in the art would understand, as the specification

4    describes, these inventions are not in a vacuum.  They're

5    described in the context of these particular wireless networks

6    like OFDMA.  And there are specifications in the art and

7    background cited on the face of the patent that describes

8    different kind of pilots that are not limited to just common

9    pilots.

10          And we have an expert in the field explaining that

11   from a perspective of a person of ordinary skill in the art

12   there are at least these two other examples.  Antenna specific

13   and at mobile station specific pilots.  And then at least with

14   respect to antenna specific, it also is consistent and aligned

15   with the specification's description of the extension of the

16   invention into multiple antenna system.

17          So it's not just kind of completely open-ended, but a

18   person of ordinary skill in the art would understand, and our

19   position is, would not be limited to a just common pilot.

20          MR. LeROY:  Your Honor, if I may respond briefly?

21          MR. HAMAD:  Your Honor, if I may finish my rebuttal?

22          THE COURT:  Yes, Mr. Hamad, you may finish.

23          MR. HAMAD:  Thank you.

24          The specification excerpts that were put on

25   defendant's slide they said things like "aspects of this

1  invention, aspects of the invention."  It was not the

2  invention, all embodiments of the invention.

3         And the *Continental* case included arguments from

4  defendant that there were descriptions and disclosures of the

5  present invention and even that to the federal circuit was not

6  enough.  The cases that they cite we had actually addressed in

7  our reply brief but those are disclaimer cases.  Verizon, in

8  particular, was distinguished in *Continental*.

9         Thank you, Your Honor.

10        THE COURT:  Thank you.

11        Okay.  And so, Mr. LeRoy?

12        MR. LeROY:  Thank you, Your Honor.

13        Just to pick up on the last point that was made.  Our

14  specific- -- the '512 specification does indeed describe the

15  common pilot signal as an aspect of the invention, but it is

16  just that, an aspect of the invention.  There may be other

17  aspects, but in all cases the invention includes that aspect.

18        But, Your Honor, in questioning NEO's counsel raised a

19  very important point and that is the public notice function of

20  patents and patent claims.

21        You know, the public is going to review the intrinsic

22  record to understand what the claims say and how they arise in

23  the context of the written description.  Here we have an expert

24  who citing nothing at all, not citing prior art on the face of

25  the patent, we have an expert who identifies other potential

1  signals not described in the patent and this is the first I've

2  ever heard that there are prior art references cited on the

3  face of the patent that might support the construction.

4          I don't know if there are or there aren't because that

5  has not been a part of this record to my knowledge.  It has not

6  been a part of the briefing or the expert analysis.

7          But even if it was true, which reference?  How is the

8  public to know that it's supposed to talk to NEO's expert or

9  which prior art reference it's supposed to read to figure out

10  the scope of the claim.  That's why *Phillips* puts extrinsic

11  evidence at the bottom.

12          Thank you, Your Honor.

13          THE COURT:  Thank you.  And our official timekeeper,

14  Mr. Weissburg indicates that you have used up almost all of

15  your time.  I think you had about maybe 10 seconds left for the

16  defense side.  So very good.

17          And the plaintiffs, I think, might have had a little

18  bit more time than that, but they have perhaps were just a

19  little bit more economical in their presentations.

20          So I think that covers everything that we have with

21  respect to all of the claims that were before the Court for the

22  construction.  And let me just confirm that, Mr. Stewart, do

23  you think we have covered everything that we need to cover?

24          MR. STEWART:  If you'd like to revisit any term, I'd

25  be happy to wax poetic a little longer, but otherwise I think

1    we have covered everything.

2            THE COURT:  Okay, thank you.  And I don't think it's

3    necessary in light of everything you have said already and all

4    also all the briefing that we have and the matters that are on

5    the record.

6            And so all of that is taken into account in making

7    this decision.  And so on behalf of the defendants, is there

8    anything defendant that believes there is anything else that we

9    are supposed to cover that we have not covered during our

10   hearing.

11           MR. HERRIGES:  Nothing further, Your Honor, from

12   defendant's perspective.

13           THE COURT:  Thank you, sir.  Very good.  All right.

14   So I want to thank counsel for your presentations today.  All

15   of you have made your oral arguments.  It's been very helpful

16   to the Court.  I know that this is complicated material.

17   Perhaps not as complicated to you as it is to me, but I have

18   enjoyed hearing from you trying to grapple with all of this and

19   continue to do so.  I'll take this under advisement for now and

20   we will issue an order that will construe these terms that the

21   parties have requested.

22           So is there anything further that we need to address

23   or can we be adjourned?

24           I don't see anybody indicating that there's anything

25   further.  Then I will ask Mr. Weissburg to go ahead and recess

1    the court and give my thanks to all of you for all of your hard

2    work you put into the case.

3              THE LAW CLERK OF THE COURT:  The Court is now in

4    recess.

5          (At 1:29 p.m., matter concluded.)

6                                    -   -   -

1                    C  E  R  T  I  F  I  C  A  T  E

2

3          I, Darlene K. May, Official Court Reporter for the

4    United States District Court, Eastern District of Michigan, do

5    hereby certify that the foregoing is a true and correct

6    transcript, to the best of my ability, from the record of

7    proceedings in the above-entitled matter.  I further certify

8    that the transcript fees and format comply with those

9    prescribed by the Court and the Judicial Conference of the

10   United States.

11

12   July 5, 2023              /s/ Darlene K. May
     Date                      Darlene K. May, CSR, RPR, CRR, RMR
13                             Federal Official Court Reporter
                               Michigan License No. 6479
14

15

16

17

18

19

20

21

22

23

24

25