UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                    **HONORABLE TERRENCE G. BERG**

**NEO WIRELESS, LLC PATENT**              **No.** 22-md-03034
**LITIGATION,**
_____/


**STATUS CONFERENCE VIA ZOOM TELECONFERENCING**

**Wednesday, September 13, 2023**


Appearances (Continued on next page):

Special Master:

Scott Edward Woloson
Law Office of Scott Woloson
1431 Wirt Road, #141
Houston, Texas  77055
(281) 352-9878
scott@scottwolosonlaw.com

                                          On behalf of Ford Motor Company:
On behalf of Neo Wireless:
                                          John S. LeRoy
Christopher S. Stewart                    Kyle G. Konz
Caldwell Cassady & Curry P.C.            Brooks Kushman
2121 N. Pearl Street, #1200              1000 Town Center, 22nd Floor
Dallas, Texas  75201                     Southfield, Michigan  48075
(214) 888-4848                           (248) 358-4400
cstewart@caldwellcc.com                  jleroy@brookskushman.com

                          -    -    -

*To obtain a certified transcript, contact:*
*Sheri K. Ward, Official Court Reporter*
*Theodore Levin United States Courthouse*
*231 West Lafayette Boulevard*
*Detroit, Michigan  48226*
*(313)234-2604 · sheri_ward@mied.uscourts.gov*

*Transcript produced using machine shorthand and CAT software.*

*Status Conference*
*Wednesday, September 13, 2023*


Appearances (Continued):

On behalf of Honda:                    On behalf of Volkswagen:
   John T. Johnson                        Daniel Yonan
   Thomas P. Branigan
   Benjamin Christoff

On behalf of Toyota:                   On behalf of General Motors:
   Paul Richard Steadman                  Joseph Anthony Herriges, Jr.
                                          James Huguenin-Love
                                          Conrad Gosen

On behalf of Tesla:                    On behalf of Nissan:
   Thomas Reger, II                       Paaras Modi
                                          Peter J. Brennan

On behalf of FCA:
   Jonathan L. Falkler
   Frank C. Cimino, Jr.

                          -    -    -

*22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

*Status Conference*
*Wednesday, September 13, 2023*

Page 3

 1                          Detroit, Michigan

 2                          Wednesday, September 13, 2023

 3                          4:15 p.m.

 4                              -   -   -

 5          **THE COURT:**  All right.  Well, good afternoon,

 6    everyone.  So I have received some information about your

 7    discovery dispute here.  This is an informal hearing.  I want

 8    to thank Mrs. Sheri Ward for being here as our court reporter

 9    to take this down, but I'm really just trying to get a sense of

10    your respective positions regarding this.

11          And so I did receive a number of last-minute materials,

12    such as slides, from a couple of the parties here, and I have

13    reviewed all of those materials, but -- so I guess since it's

14    plaintiff's case, Mr. Stewart.  I'll give you the chance to

15    start off here, and why don't you give me a thumbnail sketch of

16    what it is you are asking for here that you are not getting.

17    Go ahead.

18          **MR. STEWART:**  And since you've said you have already

19    reviewed the slides, I won't bother sharing them and going

20    through that formally unless you would like me to.

21          In terms of a thumbnail sketch, what we are really after

22    here is all of the different ways that defendants make money or

23    obtain value from the use of cellular connectivity in their

24    cars because the patents-in-suit in this case are core pieces

25    that enable LT and 5G connections in those cars.

         *22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

*Status Conference*
*Wednesday, September 13, 2023*

*Page 4*

1    The accused products that we accuse in our complaint and

2   our infringement contentions are the vehicles themselves that

3   defendants' sell, and the ways that defendants make money off

4   of the cellular connectivity in those cars is three fold.

5    They sell the cars themselves with this connected

6   functionality, and so there's some portion of that price that a

7   customer is paying to be able to buy that cellular ability in

8   their vehicle.

9    There is also connected services they sell that you can

10   access in that car by the cellular connection, and then there's

11   a third category, which is the ways that defendants use the

12   data that they collect from the cellular connection in the cars

13   to generate either cost savings or some other sort of revenue,

14   by selling data or monetizing it in other ways.

15    And so we have been negotiating with defendants about how

16   to get all of those potential damages inputs from defendants so

17   that we can run the numbers and work with our damages experts

18   to get to a damages case that accurately reflects the value of

19   these inventions.

20    And so the impasse we sort of initially were at that was

21   defendants just wanted to provide TCU hardware costs, which is

22   one particular component.  It's a box of chips and wires that

23   goes into the car somewhere.  They wanted to provide their cost

24   that they purchased that one component for and call it the end

25   of the day or call it quits.  We thought that we were entitled

*22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

*Status Conference*
*Wednesday, September 13, 2023*

Page 5

1  to full vehicle-level financials about all the things that --

2  the ways that they make money on these cars, the accused

3  products.

4      **THE COURT:**  Are you saying you want to find out how

5  much money they make like, shall we say, as a profit on the

6  sale of a particular car?

7      **MR. STEWART:**  That's right.  Initially in our initial

8  proposal --

9      **THE COURT:**  Why would you be eligible to get that?

10  Don't you have to show that somehow or another this technology

11  is the driving force behind why somebody would purchase a

12  vehicle before you could get that?

13      **MR. STEWART:**  Your Honor, if we were to use that

14  vehicle price as our actual royalty base at trial, if that was

15  our actual damages expert's report, was, hey, here is the

16  $70,000 price of the car, we want a 5 percent royalty on that

17  car value, then we would have to prove what you just said, that

18  the entire market value of the vehicle was tied to our specific

19  invention.

20      We don't have to prove that, though, to use it as one of

21  the inputs that we then step down from, right?  To be able to

22  assess even just the portion of that price that is attributable

23  to the connection, the cellular activity that is at issue in

24  this case, we have to start somewhere.

25      **THE COURT:**  Well, why -- we have this information

*22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

*Status Conference*
*Wednesday, September 13, 2023*

Page 6

1  from Avanci or whatever that's actual licensing information.

2  Isn't that the most relevant?  I mean isn't that a reasonable

3  royalty?  Isn't that a lot more relevant than what you're

4  talking about?

5        **MR. STEWART:**  Your Honor, honestly, that's a very

6  good point because part of the reason that we need some of

7  these additional materials that we are asking for that we

8  aren't getting is to be able to do a complete comparable

9  license evaluation.

10      Because what happens when you use a comparable license,

11  whether it's the Avanci license or other licenses that Neo has

12  entered into with other parties or licenses we get from

13  defendants, when you do a comparable license damages model,

14  what you have to do is look at the ways that the comparable

15  license evaluated the value of the technology and accommodate

16  differences between that --

17        **THE COURT:**  The licenses are for this.  They are for

18  the use of this technology in cars.

19        **MR. STEWART:**  Your Honor, I agree with you.  In some

20  circumstances they are just directly a per-unit royalty perhaps

21  for this technology in cars.

22      In other instances, though, the way that the royalty is

23  determined might not be that simple.  It might be that you

24  start with --

25      For example, there are often licenses in industry-wide

*22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

*Status Conference*
*Wednesday, September 13, 2023*

Page 7

1  scenarios where the license itself starts with the total price

2  of the product and just applies a particular percentage.  Maybe

3  it's a smaller percentage if the feature --

4  **THE COURT:**  That makes no sense to me here.  I don't

5  see that.  That seems like it's really shooting for the stars

6  here.

7  **MR. STEWART:**  Your Honor, if I could just add

8  one more detail, but I didn't want to interrupt you.

9  **THE COURT:**  Okay.

10  **MR. STEWART:**  Just to avoid getting into too much

11  confidential information on this hearing, but there are

12  licenses in this case that we are trying to evaluate.  Like,

13  for example, the license related to Mercedes Benz, the

14  defendant who has been dismissed from the case, where the

15  inputs that went into determining that license were broader

16  than just the TCU cost or the cost of that particular model and

17  were different than just applying a particular numerical

18  royalty to a unit.

19  So this is in abstract, and, again, I don't want to get

20  into too many details because this isn't expert report time yet

21  and we haven't fully evaluated this, but there are licenses in

22  this case where we would need more inputs than just a plain old

23  number to evaluate damages fully.

24  And so it may be the case that when we get to expert

25  report time defendants want to rely exclusively on, for

*22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

*Status Conference*
*Wednesday, September 13, 2023*

Page 8

1  example, that Avanci model, the Avanci situation, as their

2  damages model, and that's what their damages expert thinks is

3  the most relevant or the most reliable, but at the discovery

4  phase, we need to be able to see all of the inputs and compare

5  them to other licenses that are relevant to the hypothetical

6  negotiation, other ways to assess damages that aren't even

7  necessarily tied to licenses and have all of those inputs at

8  our disposal to fully assess damages.  There is no

9  one-size-fits-all way to do damages.

10      **THE COURT:**  Are you saying that from Mercedes Benz

11  you received this exact type of information in order to

12  determine what a reasonable royalty was?

13      **MR. STEWART:**  Your Honor, without wanting to go into

14  so much detail, the variables that were discussed, whether it

15  was explicitly provided in this format or not because it was

16  early on in the case, there wasn't fact discovery, there wasn't

17  all of this in-depth analysis, I can't say, but I can tell you

18  that the comparable -- the way to assess --

19      **THE COURT:**  No, stop.  Okay.  Let me hear from the

20  other side on this.

21      I really don't want to hear from every single defendant

22  here so who is going to address this?

23      **MR. LeROY:**  Thank you, Your Honor.  This is

24  John LeRoy.  I am here representing Ford, but on this issue I

25  think we speak with one voice, and I have been invited to

*22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

1   speak, if that's okay with you.

2           **THE COURT:**  Go ahead.

3           **MR. LeROY:**  Your Honor, this is not the first case in

4   which a patentee with a patent on a feature is seeking, you

5   know, revenues and financials associated with a much larger

6   product into which it's installed.

7       I think most of the counsel on this -- the patent counsel

8   on this call remember there was a day about 25 years ago where

9   you could do that in patent law.  You could present the jury

10  with revenues of a big product and then do exactly what

11  Mr. Stewart described and start deducting from there.  Of

12  course, only the defendant does the deducting.

13      And in 2010 with the *Uniloc* decision, which is the lead

14  decision, and also *ResQNet* -- those are the two most popular

15  decisions out of the Federal Circuit -- said that has to stop.

16  I have a quote in the slides, because you can't put the

17  $49 million cat back in the bag.  Once the top-line number

18  comes into evidence, the courts have recognized it's hard to

19  unring that bell, you know, in cases where the patent is on a

20  feature.

21          **THE COURT:**  Okay, but hold on.  He's not saying

22  necessarily he's going to try to put that into evidence, and

23  that would be something that would be decided later, and I

24  don't think I would necessarily let that come into evidence.

25      But here he's saying that he needs it in order to figure

*Status Conference*
*Wednesday, September 13, 2023*

Page 10

1    out what a reasonable royalty would be, and he's asserting that
2    perhaps like with respect to Mercedes Benz they gave him either
3    this information or they estimated it sufficiently so that he
4    could discuss it with them and reach a settlement in the case.
5         So why is it that you don't have to, but they did?
6              **MR. LeROY:**  Thank you, Your Honor.
7         First, I don't believe, and I would invite Mr. Stewart to
8    demonstrate to you, that Mercedes Benz disclosed any
9    vehicle-level financial information.  They may have disclosed
10   the number of these products that they have -- you know, number
11   of vehicles sold that have this feature because, of course,
12   that's always relevant.
13        I think that the chances of Mercedes Benz actually
14   providing the sorts of vehicle-level pricing information that
15   Mr. Stewart is looking for here from who is remaining in the
16   case is low.  It may have been something in the back of
17   Mr. Stewart's mind how we can all go on line and see what
18   people sell vehicles for, I suppose, but I would challenge
19   Mr. Stewart to demonstrate to Your Honor that in fact
20   Mercedes Benz disclosed the confidential vehicle-level pricing
21   information Mr. Stewart is looking for here.
22             **THE COURT:**  Well, how far are you away -- do you
23   think? -- from maybe trying to reach some kind of accommodation
24   between you on this issue?  Because.
25        Here is how I see this, okay?  I mean this is a

           *22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

*Status Conference*
*Wednesday, September 13, 2023*

*Page 11*

complicated question.  We're not going to resolve it right now
on this hearing.

And I want to thank Mr. Woloson for his detailed briefing
that he gave me after talking to you, and thank you all for
talking to him about it so that he would understand it.

But I can tell you that my gut reaction as it stands right
now is that these requests are seeking more information than I
think is really necessary for purposes of trying to determine
what would be a reasonable royalty in the case.

Now, I don't know what happened with respect to
Mercedes Benz.  I will say that it gives me some optimism or
hope that, if they can do it, why can't you guys do it.  Why
can't you guys get together and say all right, what would be
reasonable here?

And I know we have the Avanci information, and as I was
saying before, if I'm understanding that correctly, that's a
pool of patents that is for the same technology and that there
are no -- or there would be no licensing arrangements that the
OEMs are paying for this very same technology.

I'm just thinking, for goodness sake, why can't you can
guys work this out?

Because what's going to happen, the only way that this can
get resolved -- we're not going to do it in this hearing right
now.  The only way it can even get resolved is if you all work
with one another and narrow it down maybe, a little more

*22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

1  narrow.

2      I've got to say I don't think that getting all of the

3  sales information for all of the vehicles of every single one

4  of these companies, how much money they are making on all of

5  the vehicles that have this technology, that is insanely huge.

6  That's a giant, you know, enormous amount of information.

7          **MR. STEWART:**  Can I respond to that quickly,

8  Your Honor?  I'm sorry.

9          **THE COURT:**  Go ahead.

10         **MR. STEWART:**  I just wanted to make clear that we

11  talked about vehicle-level financials early on, and we have

12  already compromised significantly.  In terms of vehicle-level

13  sales numbers like you have just referenced right there, all we

14  are asking for now is that, in addition to providing the costs

15  and resale value of the TCU, the one component that they want

16  to provide us for, they also provide the cost of the

17  infotainment system, which is basically the touch screen, the

18  interface that a user uses to access a lot of these connected

19  features.  We have narrowed it down from everything about the

20  vehicle to just those two components in terms of vehicle-level

21  sales data.  We want those two components and nothing else on

22  that front.

23      So I just want to make clear that we are not still over

24  here asking, hey, we want the price of your tires and how much

25  you sell the tires for.  We are down to just TCU and

*Status Conference*
*Wednesday, September 13, 2023*

*Page 13*

infotainment system only, which are the things we think are most closely associated with use of these patented technologies.

**THE COURT:**  You are not asking for the profit margin on the entire vehicle?

**MR. STEWART:**  No, we have compromised on that and said, look, if we end up needing that in the damages report for some sort of balancing or check purpose, we'll try to find that publicly, but we're not asking for that now.

**THE COURT:**  But you haven't made any kind of compromise regarding all of this monetization that you are talking about trying to get, how much money they make from just monitoring driver usage patterns and things like that; right?

**MR. STEWART:**  That is right, Your Honor, because we think that is just -- it's closely related to the cellular connections.

Part of the infringement that we have alleged is that they infringe and induce their customers to infringe when they collect that data over a cellular connection.  So they are using the patents every time they go and grab a piece of data from that car over a cellular connection.

And we're not asking for every piece of data you track across any type of connection.  Just the cellular connections.

And so we think that is unlike tires or chassis or wheel wells or whatever.  We think that is closely enough tied to the

*22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

Status Conference
Wednesday, September 13, 2023

Page 14

1  cellular-connected technologies at issue here that we should

2  get the universe of that information, how they are using this

3  to make money.

4        **MR. LeROY:**  Your Honor, I haven't had an opportunity

5  to respond here.  You had asked Mr. Stewart at the beginning of

6  this call was he seeking vehicle profits, and he told you yes,

7  and so, of course, I stated the defendants' position on that.

8  If he's no longer seeking vehicle profit, that's tremendous

9  progress.  I'm happy it's on the record.

10       If we now turn to -- there's been some acronyms, TCU and

11  infotainment.  Those are important words because, if you recall

12  from the tutorial, Your Honor, the TCU is the box.  You can

13  think of it as the black box that has the modem inside of it,

14  and the infotainment is just a completely different box, and

15  I'll come back to that in a moment, but what I want to make

16  clear because Your Honor said compromise, I want to make sure

17  that you are aware of the level of compromise that the

18  defendants have offered in this case.

19       Beyond the microchip inside of which these patents exist,

20  for which defendants have made available the value of that

21  microchip, defendants have made available to Neo the price they

22  purchased the black box, the TCU, for, which is 360 parts

23  beyond what are at issue in this case.  The defendants have

24  agreed to turn over, if they have a price for which they sell

25  that black box, they have turned that over.

22-md-03034; In Re: NEO Wireless, LLC Patent Litigation

*Status Conference*
*Wednesday, September 13, 2023*

Page 15

1    So now we have got the modem chip, we have provided those

2    financials.  We have got the box, we have provided those

3    financials.  On top of that, we have what Neo calls connected

4    services, also things their patents have nothing to do with.

5    Remember, their patents are exclusively inside of

6    one microchip.

7         **THE COURT:**  But they need the use of the patent to be

8    able to gather that information.

9         **MR. LeROY:**  And I understand that, and, Your Honor,

10   there was a time when off the record we had a big debate about

11   how far could Neo really go, how far would we anticipate

12   Your Honor would order us to disclose information, and instead

13   of bothering you, Your Honor, we decided to turn over what Neo

14   describes as the use of that circuit and we have agreed to turn

15   over our what they call connected services, right?

16   So the data swirling around that is exchanged into and out

17   of that box, we are not fighting about that.  Most of us have

18   already turned it over.

19   The issue for the moment is this other box called -- which

20   Mr. Stewart calls infotainment.  Your Honor will recognize that

21   when you get into your vehicle and you want to plug in a

22   bluetooth or a -- you know, connect a bluetooth device or plug

23   in a USB device or touch the screen, in most of these vehicles

24   that's supported and enabled by some box that's not in this

25   case.

*22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

*Status Conference*
*Wednesday, September 13, 2023*

Page 16

1       It's called -- well, there are a bunch of different names

2   for it, but it's a different box.  It's not this TCU.  It's

3   separately sold.  It's separately designed.  It has nothing to

4   do with any of the patents in this case.

5           **THE COURT:**  Right.  In my case I call it the thing

6   that doesn't really work when I want it to.  Go ahead.

7           **MR. LeROY:**  We were all afraid you might say that,

8   Your Honor.  But that is a different -- it's a different

9   animal, and in our view, as in many cases, we view this

10  expansion or creeping of scope.  Now we're getting into a

11  different thing altogether, different engineers, different

12  purchasing, different suppliers.  Everything about it is

13  different, and none of it is patented.

14      So that's where we have drawn the line, Your Honor.  If

15  Mr. Stewart is no longer looking for vehicle profits, great.

16  We are not holding back on financials just at the chip level.

17  I think we are at that middle ground with the exception of this

18  infotainment box.

19          **THE COURT:**  Well, how hard is it to provide some of

20  this infotainment box stuff?  It sounds like it's interrelated

21  with the TCU to some degree because how else do they connect to

22  the infotainment without the cellular connection?

23          **MR. LeROY:**  I don't have a drawing on that,

24  Your Honor, but they do not connect to each other at all.

25  They -- one is, like you said, is the box that doesn't work,

*22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

1    and the other is for making cellular phone calls.  They are in

2    different locations in the vehicle.

3         They don't talk to each other any more than any other

4    vehicles in the -- I'm sorry.  Those two boxes don't

5    communicate with each other any more than any other two boxes

6    on the vehicle over the vehicle network.

7         **THE COURT:**  So you're saying that the infotainment

8    box does not use 4G or 5G cellular technology?

9         **MR. LeROY:**  I -- well, it doesn't use it any more

10   than the rest of the vehicle, I guess I would say.  Like, for

11   example, the TCU, the cellular box, collects codes like how

12   many miles you have driven or do you have a tire that's low.

13        That box collects information from all over the vehicle,

14   and then it sends off to headquarters, and somehow you get a

15   text message or something.  So does it -- it uses it as much as

16   the rest of the vehicle, but to somehow turn over all of the

17   financials, where would we stop and why would we -- let me back

18   up.

19        We are disclosing to Neo the fact that we have that usage,

20   and if we make money on it, we are turning over the contracts,

21   the revenue streams.  You know, Neo is getting -- I find it

22   interesting they want to go further.  They are getting access

23   to, as best I can tell, all revenue-generating streams that

24   exist that use that TCU box.

25        The module itself is just another box in the vehicle.

*Status Conference*
*Wednesday, September 13, 2023*

Page 18

1   It's no more relevant than the battery or the steering wheel

2   or -- I'm not sure why they want it, frankly.

3          **THE COURT:**  You're not sure why they want the

4   infotainment?

5          **MR. LeROY:**  Correct.

6       I should note, just so we have a clear record, at least

7   one of the defendants, some of their products have the cellular

8   modem in the infotainment module.  Of course, that would be

9   turned over because in that one instance it is effectively a

10  TCU.

11      I just want to have a clear record on that.  There is no

12  fight over that.

13         **THE COURT:**  So, Mr. Stewart, how is the -- how is the

14  cellular technology, the 4 or 5G cellular technology, being

15  used with respect to the infotainment box?

16         **MR. STEWART:**  Your Honor, I'm relying a little bit on

17  public information, to some extent.  I don't know that I have a

18  full technical insight into that, but some of what Mr. LeRoy

19  said informs our choice to limit it to that particular piece.

20      As he mentioned, our understanding of the way that TCU

21  works is it gathers data from all over the car, like he said.

22  There are sensors that are impacted that also get transmitted

23  over LG, the infotainment system and other components that feed

24  the TCU with data that is transmitted.

25      The reason we picked the infotainment system as a

*22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

*Status Conference*
*Wednesday, September 13, 2023*

Page 19

1  compromise was because we do know that, at least in some

2  instances, an infotainment system is sold with the TCU already

3  embedded.  So the assumption there is that is sort of a package

4  that is frequently sold together and, therefore, closely

5  associated, and just from my own personal experience in a car,

6  I know that a lot of the things you access the internet for,

7  Spotify or Google or to do remote start or whatever, you use

8  that infotainment system, that interface.

9          **THE COURT:**  But he's telling you that they are going

10  to give you that.

11          **MR. STEWART:**  I think he's saying --

12          **THE COURT:**  If they are together, he says they are

13  going to give you that.  What if they are not connected?

14          **MR. STEWART:**  If they are not connected, that doesn't

15  mean that they are not sort of logically connected and still

16  closely related in terms of the way the customers use the

17  cellular connection.

18      The ones that are connected, obviously I'm happy to

19  receive that, but that's sort of incidental, right?  The fact

20  that these two closely related parts are sometimes sold

21  together doesn't make them unrelated to each other when they

22  happen to be sold separately.

23          **THE COURT:**  Well, what if we kind of do this, and I

24  don't know if this helps or not, but if it would be possible

25  for those companies that have infotainment systems that they

*22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

*Status Conference*
*Wednesday, September 13, 2023*

Page 20

1    say are separate from the TCU, if they could possibly provide

2    information that would explain from a technological point of

3    view why they are taking the position that these infotainment

4    centers are not utilizing the patented technology.

5        Then that would be a start, and if they can't actually --

6    they can't explain that well, well then maybe they are using

7    it.

8        But I mean somehow or another, it seems to me, if they

9    are -- if the cellular technology is somehow being used by

10   these infotainment centers, then it does seem like they would

11   be subject to disclosure as directly utilizing the technology

12   and would fall within an area that it seems like that

13   plaintiffs could reasonably get.

14       And it sounds like you are already together somewhat on

15   the monetization as it relates to the TCU, but not necessarily

16   to however information from the infotainment center is

17   monetized.  Is that right?

18           **MR. LeROY:**  Your Honor, we're certainly always happy

19   to confer with Neo.  I just wanted to circle back to a couple

20   of points.

21       Number one is they are seeking financials.  Nobody is

22   withholding how things work or what's connected to what.  If

23   they have got a question and it's relevant to the TCU, I don't

24   think anybody is -- I don't even think that's what we're

25   fighting over.  They want to run the numbers up.

*22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

*Status Conference*
*Wednesday, September 13, 2023*

Page 21

1        **THE COURT:**  If you think that he doesn't understand

2   or he's saying that he's not sure if infotainment systems use

3   this or not --

4        **MR. LeROY:**  Well, when you say "use," lots of vehicle

5   components use the circuit in a pure sense.  Just like the

6   battery.  A lot of -- you know, all electrical components would

7   use the battery.  But their patents are inside of a -- their

8   patents make no mention -- they don't even mention a vehicle,

9   let alone the use of this data.

10       So we are now beyond the microchip, beyond the module in

11   which it's installed.  We're over in some other module that it

12   doesn't connect to.  Of course, some defendants, it's a

13   different story.  Those are not at issue here.

14       I just want to make note that we can share that

15   information, but the issue will be the same, that their patents

16   don't extend to this other box, and this box doesn't use it any

17   more than any other component of the vehicle.

18       So I don't know where we would stop.  He says only those

19   two, but -- and, well, for Ford I know there are many versions

20   over many vehicles throughout the country.  When you say just

21   turn over those financials, it's an understatement to say it's

22   a large project.

23       **THE COURT:**  I didn't say just turn over financials.

24   I didn't say that.

25       **MR. LeROY:**  Okay.

       *22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

*Status Conference*
*Wednesday, September 13, 2023*

Page 22

1    **MR. STEWART:**  I said that you needed to maybe share

2    how the infotainment system works to see whether or not it was

3    using the cellular technology for 5G or 4G that they are saying

4    they --

5        **MR. LeROY:**  Sure.

6        **THE COURT:**  -- may be using.

7        So, anyway, I would encourage you to do that.  Talk to

8    each other about that.  See if you can come to an agreement

9    with respect to is the infotainment system using 5G technology

10   or not.  If it is, then I think that the information relating

11   to that would seem to be comparable then to the information

12   regarding the TCU that you have already resolved.

13       I don't think getting information regarding the entire

14   vehicle price is relevant at this point, and I'm glad at this

15   point Mr. Stewart is saying he doesn't necessarily seek that.

16       So I don't know if that helps you at all to give you a

17   little bit of guidance, but what I was saying before was that

18   the only alternatives we have here is either you all work

19   together on this and work it out and move forward, you know, as

20   well as you can, or you end up briefing it.

21       And then we're in a situation where everything is going to

22   take longer because you all have to file your briefs, and it's

23   going to be fairly complicated, and then either I or a

24   magistrate judge will have to rule on that, and there's at

25   least a possibility that it might not go so well.

*22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

*Status Conference*
*Wednesday, September 13, 2023*

Page 23

1       In other words, I don't know, Mr. Stewart, it could be

2  that you get even less than what you're hoping for or what you

3  might be able to convince them to give you if a court were to

4  look at this and say, well, it was just too broad.

5       And then, on the other hand, it could be, you know,

6  Mr. Ford, that a court would look at this -- I'm sorry -- yeah,

7  Mr. LeRoy would say, you know, sorry, but you have got to give

8  over even more than you thought you had to give over.

9       And so that's the risk that you guys will be playing as

10  well as the delay involved if we litigate this.  So I hope you

11  guys can try to work it out.

12      So that's -- I think that's all I want to do right now.

13  What I would say is let's have you go back to your corners and

14  go back to talking to one another, and, if necessary, we can

15  talk in about 30 days to see where you are.  If you work it out

16  within 30 days, then we don't necessarily have to talk again.

17      But I think you should be able to try to work this out in

18  a reasonable fashion here because you're not really that far

19  apart with respect to the theory behind what should be

20  producible here.

21      Now, do we need to talk about this Avanci thing or what do

22  we need to talk about because I have only got about 10 minutes?

23          **MR. LeROY:**  Your Honor, that's in the opposite

24  direction.  That's the defendants trying to obtain some

25  information from Neo.

*22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

*Status Conference*
*Wednesday, September 13, 2023*

Page 24

1    So that is something that -- this follows on your earlier

2    point where your view is that Avanci is very relevant to this

3    case.  Every defendant on this call agrees with that.

4    Avanci is the largest world's license that there is to

5    these kinds of patents, and the defendants are all parties to

6    that.  So we think -- so let me back up, if I may.

7    That pool already exists, but the information we are

8    seeking here are details surrounding Neo's attempt to join that

9    pool.  There was a negotiation that they have admitted took

10   place in 2022.  They have admitted that figures were exchanged,

11   and they are willing to turn those over.  I just want to be

12   fair to -- I might have said Avanci.  I want to be fair to Neo.

13   Neo has said that they will turn over the numbers, but

14   there are two categories of information that Neo said they will

15   not provide which we think are highly relevant, and there's no

16   basis for withholding them.

17   The first category of information are Neo provided some

18   charts and some analysis to Avanci, right?  They wanted to join

19   Avanci as a patent owner, and Avanci doesn't just let anybody

20   sign up.  Asked them or received, in any event, some charts and

21   analysis from Neo that presumably dealt with the relevance of

22   their patents.

23   Avanci then takes those and analyzes them and then makes

24   an offer or gives feedback.  We know this because we know how

25   Avanci works generally.

*22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

*Status Conference*
*Wednesday, September 13, 2023*

Page 25

1    And we can take these one at a time, but Neo has said they

2    should not have to turn over to the defendants the analysis and

3    charts that they shared with Avanci.  That analysis is relevant

4    to two very important -- well, possibly three, but at least two

5    very important issues in this case:

6        Infringement.  Because the whole analysis will be whether

7    Neo's patents are or are not practiced by the relevant

8    technology.

9        And damages.  That was the input that led to Avanci's

10   royalty offer as a patent owner.

11            **THE COURT:**  Okay.  Let me hear from Mr. Stewart.

12            **MR. STEWART:**  Certainly, Your Honor.  The things that

13   we're withholding are just classic work product.  They are

14   claim charts, infringement charts that were prepared in

15   anticipation of litigation with attorneys, and the only way

16   they were shared was under NDA, not with an adversary, not with

17   one of the defendants, but with a third party that was bound by

18   this NDA and was not more likely to provide it to an adversary.

19       Under work product law, work product protection is not

20   waived unless you disclose it or make it substantially more

21   likely that it will end up in the hands of an adversary.  It's

22   different than attorney-client privilege.

23       These claim charts are our work product about how we

24   viewed the infringement of the patents-in-suit.  And so even

25   though we'll tell them the negotiations and the details about

*22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

*Status Conference*
*Wednesday, September 13, 2023*

*Page 26*

1  the actual communications, we're just going to hold back those

2  claims charts, which are work product that has not been waived.

3  **THE COURT:**  Okay.  Well, the way I see this is that

4  this case is different from whatever was going on with Avanci

5  and your claims that you were making at that time, and I don't

6  think you should have to disclose what you said then.

7  You might be taking a different position now, and you are

8  entitled to do that, and so I'm not going to make you disclose

9  those.  I don't think you have to disclose those.  I think they

10  are work product.

11  And you do have to disclose the amount of what you were --

12  what you were being offered and what you were negotiating with

13  respect to a reasonable royalty.  That's what's at issue here,

14  and I think it's very relevant, and that's what you have to

15  disclose, and so just go at it that way.

16  **MR. LeROY:**  Your Honor, if I can --

17  **THE COURT:**  -- say what he was claiming before.  It's

18  not relevant.  Who cares what he was claimed before?

19  **MR. LeROY:**  Your Honor, if I may.

20  They have already stated in an interrogatory response that

21  their negotiations with Avanci were specifically about the

22  defendants.  These aren't some random charts.

23  And we're not -- I want to be clear.  We're not seeking

24  Neo's internal privileged materials.  We're seeking what they

25  gave to Avanci about defendants that they told us they did.

*22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

*Status Conference*
*Wednesday, September 13, 2023*

*Page 27*

1       **THE COURT:**  What do you mean "about defendants"?  I

2  don't understand.  Like what?

3       **MR. LeROY:**  So the defendants in this case are Avanci

4  members.  The value --

5       **THE COURT:**  What are you saying that they said about

6  defendants?

7       **MR. LeROY:**  They have already told us the stuff he's

8  withholding is about defendants.  They have told us that.

9       **THE COURT:**  What stuff?

10       **MR. LeROY:**  Two things.  The claim charts and

11  analysis, which is thing one, and thing two is some group

12  settlement offer that they claim they made that we have never

13  received.

14    This is highly relevant.  Judge, this is not some one-off

15  or unrelated exchange.  This is exclusive limited to who is

16  here on this phone call, and they have said that in their

17  interrogatory response and their correspondence.

18    And this happened after the complaint -- I think after the

19  complaint was filed.  This is not unrelated to this case.  It

20  is directly related, and that's why they don't want to turn it

21  over.

22    Your Honor, we would ask for an opportunity to brief this

23  issue.  This is -- and you may rule against us, but we would

24  beg the opportunity to brief the issue.

25       **THE COURT:**  All right.  Well, you are limited to

*22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

*Status Conference*
*Wednesday, September 13, 2023*

Page 28

1  10 pages.

2         **MR. LeROY:**  Thank you.

3         **THE COURT:**  And we'll take a look at what you have to

4  say because it's not clear to me why this would be relevant to

5  your defense in this case.  But, as I said, the amount is

6  relevant so ...

7         Okay.  So I think that's about as far as we are going to

8  get right now.  We'll reconvene and circle the wagons again in

9  about 30 days and see where you all are.

10        It does seem to me that you all have been doing a pretty

11  good job working with one another and with Mr. Woloson on the

12  case, and I do appreciate that, and I hope you keep going in

13  that direction because I want to be as efficient as possible

14  given the scope of the case and how, you know, additional

15  delays would not be in anybody's interest.

16        And so let's keep trying to go in that direction.  I know

17  Mr. Woloson is willing to speak with you and set up calls if

18  you have issues and you want to speak with him in a way that

19  you think would advance the case.  I think he would be willing

20  to do that, and I would authorize him to do that.

21        And so let's adjourn for now.  Is there anything else

22  either of you would like to say before we adjourn?

23        **MR. STEWART:**  Nothing from plaintiff.  Thank you,

24  Your Honor.

25        **MR. LeROY:**  I don't think there's anything for

*22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*

*Status Conference*
*Wednesday, September 13, 2023*

Page 29

1   defendants, Your Honor.

2           **THE COURT:**  Okay.  So, Mr. LeRoy, you can get that in

3   in about two weeks, okay?

4           **MR. LeROY:**  Thank you, Your Honor.

5           **THE COURT:**  All right.  Thank you very much.

6   Bye bye.

7       (Proceedings concluded at 4:52 p.m.)

8                           -   -   -

9                 C E R T I F I C A T I O N

10      I certify that the foregoing is a correct transcription of

11  the record of proceedings in the above-entitled matter.

12

13  s/ Sheri K. Ward                        9/21/2023
    Sheri K. Ward                           Date
14  Official Court Reporter

15                          -   -   -

16

17

18

19

20

21

22

23

24

25

*22-md-03034; In Re: NEO Wireless, LLC Patent Litigation*